641 So.2d 381 (1994)
Frank A. WALLS, Appellant,
v.
STATE of Florida, Appellee.
No. 80364.
Supreme Court of Florida.
July 7, 1994.
Rehearing Denied August 31, 1994.
*384 Nancy A. Daniels, Public Defender and W.C. McLain, Asst. Public Defender, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen. and Mark C. Menser, Asst. Atty. Gen., Tallahassee, for appellee.
KOGAN, Justice.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Frank A. Walls. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
During the early morning hours of July 22, 1987, in Okaloosa County, a neighbor heard loud noises coming from the mobile home of the victims, Edward Alger and Ann Peterson. When Alger failed to report for duty at Eglin Air Force Base, where he worked, his superior officer Sergeant John Calloway went to Alger's home. The body of a nude female was discovered in the front bedroom. Calloway left immediately to telephone police.
When investigators arrived, they identified the woman as Peterson. She was lying face down on the floor of the front bedroom, shot twice in the head. Alger's nude body was found on the floor of the second bedroom. His feet were tied with a curtain cord and a piece of the same cord was tied to his left wrist. Alger had been shot three times and his throat cut.
A warrant was obtained to search the mobile home where Walls lived with his roommate. The warrant was issued based primarily on information given to the investigators by Walls' former roommate, who lived in the mobile home adjacent to that of the victims. A number of items were seized during the search that were linked to the crime scene. Walls was charged with ten offenses. Some of these charges were dismissed or reduced to lesser offenses following Walls' motion for judgment of acquittal at the conclusion of the trial.
Following his arrest, Walls gave a statement to the investigators detailing his involvement in the murders. In this confession, Walls indicated that he deliberately woke up the two victims by knocking over a fan after entering the house to commit a burglary. Then he forced Alger to lie on the floor and made Peterson tie him up so that his hands were "behind the back, ankles shackled." He next forced Peterson to lie on the floor so he could tie her up in the same manner.
Walls stated that Alger later got loose from his bindings and attacked Walls. During the fight, Walls tackled Alger, forced him to the floor, and "caught [Alger] across the *385 throat with the knife." Alger continued struggling with Walls and succeeded in biting him on the leg. At this point, Walls apparently dropped his knife. Walls then pulled out his gun and shot Alger several times in the head.
Walls returned to Peterson. He found her "laying in there crying and everything, asked  asked me some questions." Walls said he could not understand what she was saying, so he removed her gag. She asked if Alger was all right. Walls said:
I told her no. I told her what was going on, and I said, "I came in here, and I didn't want to hurt none of y'all. I didn't want to hurt you, but he attacked my ass, and things just happened.
Walls then untied Peterson, and "started wrestling around with her." During this second struggle, he ripped off Peterson's clothing. Walls' confession stated:
[Peterson] was like curled up crying like. I don't know, I guess I was paranoid and everything. I didn't want no, uh, no witnesses.
... .
I  all I know is just  all I know I just went out, and I just pulled the trigger a couple of times right there behind her head.
... .
I mean close range, I mean shit, it's got powder burns (unintelligible) and everything.
Walls stated that after the first shot, Peterson was "doing all kinds of screaming." He then forced her face into a pillow and shot her a second time in the head.
Walls pled not guilty and filed several pretrial motions, including a motion to determine his competency to stand trial. Five experts testified, three stating Walls was incompetent and two finding he was competent. The trial judge agreed with the latter two experts and held that Walls was competent to stand trial. The jury found Walls guilty of all charges submitted and later recommended life imprisonment for the murder of Alger and death for the murder of Peterson. The trial judge concurred. The conviction later was reversed and a new trial ordered. Walls v. State, 580 So.2d 131 (Fla. 1991).
At the retrial, venue was moved from Okaloosa to Jackson County because of pretrial publicity. The State's guilt-phase case consisted primarily of the physical evidence, testimony by investigating officers, testimony by a pathologist, and Walls' taped confession, which was played for the jury. Walls chose to present no case in the guilt phase. The jury later found Walls guilty as charged.
During the penalty phase, the defense presented a case that detailed Wall's considerable history of violent or threatening behavior, various emotional problems, and extensive treatment for the latter, including a stay in an Eckerd residential youth camp. A psychiatrist who had treated Walls when he was sixteen years old stated that he had placed Walls on the drug lithium carbonate to control his bipolar mood disorder (also called manic-depressive disorder). At some point, the psychiatrist said, Walls ceased taking the drug.
When asked if Walls had ever been under the influence of extreme mental or emotional disturbance, the psychiatrist stated:
He showed some severe difficulties with acting-out behavior. When you get to the point of pushing teachers, getting to the point of being placed in an [emotionally handicapped] class because you can't control your behavior, you have reached a point where you are having severe behavioral problems. I don't know that I would use the word extreme, but I would probably use the word severe.
... .
I evaluated him at age 16, which was long before the murder took place, so I can't testify to what his state of mind was at the time that the murder took place.
However, the psychiatrist did agree that, at age sixteen, Walls understood right from wrong and legal from illegal behavior.
An expert psychologist stated that Walls' IQ actually had declined substantially during the years prior to the trial. This psychologist answered yes when asked whether "Walls' conduct was substantially impaired or impaired to any degree in July of 1987" *386 (emphasis added), when the murder was committed.
After the penalty phase, the jury recommended the death penalty for the Peterson murder by a unanimous vote.[1] The judge sentenced Walls to five years for burglary of a structure, twenty years for the armed burglary of a dwelling, twenty years each for two counts of kidnapping, and two months for petty theft. Walls again received a life sentence for the murder of Alger and death for the murder of Peterson.
The judge found six aggravating factors supporting the death penalty in this instance: (1) prior violent felony conviction (the contemporaneous murder of Alger); (2) murder committed during burglary or kidnapping; (3) murder committed to avoid lawful arrest; (4) murder committed for pecuniary gain; (5) the murder was heinous, atrocious, or cruel; and (6) the murder was cold, calculated, and premeditated.
The court found the following mitigating factors, but concluded that they were of insufficient weight to preclude the death penalty here: (1) Walls had no significant history of prior criminal activity; (2) Walls' age at the time of the crime (nineteen); (3) Walls had been classified as emotionally handicapped; (4) Walls had apparent brain dysfunction and brain damage; (5) Walls had a low IQ so that he functioned intellectually at about the age of twelve or thirteen; (6) Walls confessed and cooperated with law enforcement officers; (7) Walls had a loving relationship with his parents and a disabled sibling; (8) Walls was a good worker when employed; and (9) Walls had exhibited kindness toward weak, crippled, or helpless persons and animals. The trial court specifically rejected the existence of statutory mental mitigators.
As his first issue, Walls appears to raise alternative arguments that a potential juror should have been excused for cause during voir dire, or that the trial court should have granted an additional peremptory challenge to the defense to excuse the juror. By that point in the trial the defense had exhausted all its peremptories. The juror in question had stated that she favored the death penalty but, on further questioning, also stated that she could follow the judge's instructions regarding the law. That being the case, we find no error on this point. Valdes v. State, 626 So.2d 1316, 1321 (Fla. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2725, 129 L.Ed.2d 849 (1994). There clearly was no sufficient reason to excuse the juror for cause, and the trial court did not abuse its discretion in declining to grant another peremptory.
Second, Walls argues that two black jurors were excused by the State in violation of State v. Neil, 457 So.2d 481 (Fla. 1984), and State v. Slappy, 522 So.2d 18 (Fla.), cert. denied, 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988).[2] Both of these jurors, however, had expressed discomfort with the death penalty. This is a sufficient race-neutral reason for the State to exercise its peremptory. Atwater v. State, 626 So.2d 1325, 1327 (Fla. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994).
As his third argument, Walls contends that jurors during his trial were kept in session for overtaxing hours. It is true that jurors worked into some evenings, and that the trial court noticed one juror beginning to nod her head. However, jurors in homicide trials throughout the state often work into the evening; and the trial court clearly intervened when he noticed the juror's head nod, before she actually fell asleep. We also find no error in the fact that this same juror expressed reluctance at being sequestered in a motel room. This reluctance appeared to stem from her erroneous belief she would not be able to retrieve clothing and medicine from her home. The trial court assigned a deputy to assist her in retrieving these articles, which resolved the problem.
*387 As a fourth issue, Walls asserts error in the penalty-phase jury instructions on aggravating and mitigating factors, including the aggravators of heinous, atrocious, or cruel, and cold calculated premeditation. As Walls concedes, the instruction on the first of these was the one upheld by this Court in Hall v. State, 614 So.2d 473 (Fla.), cert. denied, ___ U.S. ___, 114 S.Ct. 109, 126 L.Ed.2d 74 (1993). Moreover, the evidence here clearly supports the existence of heinous, atrocious, or cruel beyond a reasonable doubt. There thus is no merit to the challenge to this instruction.
As to cold calculated premeditation, there is no doubt that the instruction given here violated the requirements recently established in Jackson v. State, 1994 WL 137914, 19 Fla. L. Weekly S215 (Fla. April 21, 1994). Defense counsel both argued that the standard instruction was constitutionally inadequate and presented his own proposed instructions to the trial court, which were rejected. Counsel also has raised the issue on appeal. To preserve the error for appellate review, it is necessary both to make a specific objection or request an alternative instruction at trial, and to raise the issue on appeal. Id. Because Walls has met these requirements, we proceed to the merits of the issue.
At oral argument, the State argued that our opinion in Jackson was wrongly decided, but we find the State's contention to this effect unpersuasive.[3] Alternatively, the State argues that the error in the present instruction was harmless beyond a reasonable doubt. We believe that, under Jackson, harmlessness does exist if the State can demonstrate beyond a reasonable doubt that the murder could only have been cold, calculated, and premeditated without any pretense of moral or legal justification even if the proper instruction had been given. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
On this issue, we must consider the nature of the murder in this case. The victim here, Peterson, was asleep when Walls intentionally woke her and her boyfriend up. She was forced to tie up her boyfriend, then was taken to another room and was bound and gagged. She had to listen to her boyfriend's struggle with their attacker, followed by the sound of shots, at which point Walls returned to her. She asked whether Alger was alive, but Walls said, "No." Walls confessed that Peterson was crying and "curled up" at one point during the fatal encounter. He admitted "wrestling" with Peterson, ripping off her clothes, shooting her non-fatally, listening to her "doing all kinds of screaming," and then shooting her in the head.
Under Jackson, there are four elements that must exist to establish cold calculated premeditation. The first is that "the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage." Jackson, 1994 WL at *4, 19 Fla. L. Weekly at S216. Here, the calm and deliberate nature of Walls' actions against Peterson establish this element beyond any reasonable doubt.
We recognize that Walls himself claimed a loss of emotional control. However, judge and jury were within their discretion to reject this statement of opinion as self-serving or inconsistent with the facts, based on the present record. The "cold" element generally has been found wanting only for "heated" *388 murders of passion, in which the loss of emotional control is evident from the facts though perhaps also supported by expert opinion. E.g., Santos v. State, 591 So.2d 160 (Fla. 1991). Such was not the case here. Walls' actions against Peterson fall within the category of a protracted execution-style slaying, which by its very nature is a "cold" crime. Coldness exists beyond any reasonable doubt.
Second, Jackson requires that the murder be the product of "a careful plan or prearranged design to commit murder before the fatal incident." Jackson, 1994 WL at *4, 19 Fla. L. Weekly at S216 (quoting Rogers v. State, 511 So.2d 526, 533 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988)). Once again, the facts of the murder itself show that this element exists beyond a reasonable doubt. Here, Walls left his first victim, weapon in hand, then returned to the place where he had left Peterson bound and gagged, then taunted and abused her before shooting her to death. At the point where Walls left Alger's body, he obviously had formed a "prearranged design" to kill Peterson, a conclusion only reinforced by the time it took for him to kill her and Walls' confession.
Third, Jackson requires "heightened premeditation," which is to say, premeditation over and above what is required for unaggravated first-degree murder. Again, the facts clearly show this element to be present. The acts by Walls not only were calm and careful, but they exhibited a degree of deliberate ruthlessness, as shown by the way he toyed with Peterson prior to her death. This was not merely a murder resulting from the specific and preexisting intent to kill; it was a murder in which Walls told Peterson that he was going to "hurt" her because of what her boyfriend had done, and in which he saw that the killing was a drawnout affair. Heightened premeditation exists beyond any reasonable doubt.
Finally, Jackson states that the murder must have "no pretense of moral or legal justification." Jackson, 1994 WL at *10, 19 Fla. L. Weekly at S217 (quoting Banda v. State, 536 So.2d 221, 224-25 (Fla. 1988), cert. denied, 489 U.S. 1087, 109 S.Ct. 1548, 103 L.Ed.2d 852 (1989)). Our cases on this point generally establish that a pretense of moral or legal justification is any colorable[4] claim based at least partly on uncontroverted and believable factual evidence or testimony that, but for its incompleteness, would constitute an excuse, justification, or defense as to the homicide. E.g., Banda; Christian v. State, 550 So.2d 450 (Fla. 1989), cert. denied, 494 U.S. 1028, 110 S.Ct. 1475, 108 L.Ed.2d 612 (1990).
Thus, we have repeatedly rejected claims that the purely subjective beliefs of the defendant, without more, could establish a pretense of moral or legal justification. E.g., Arbelaez v. State, 626 So.2d 169 (Fla. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2123, 128 L.Ed.2d 678 (1994); Banda; see Dougan v. State, 595 So.2d 1 (Fla.), cert. denied, ___ U.S. ___, 113 S.Ct. 383, 121 L.Ed.2d 293 (1992). However, we have found such justification where some factual evidence or testimony supported a colorable though incomplete claim of self-defense, typically because the victim had threatened violence against the defendant at some recent point in the past. Christian. This has been true even where the only evidence to this effect was uncontroverted factual testimony of the defendant himself that nevertheless was consistent with the facts surrounding the murder. Cannady v. State, 427 So.2d 723 (Fla. 1983).
In the present case, we see absolutely no evidence, much less a colorable claim, establishing a pretense of moral or legal justification. As to Peterson, there is no construction of the facts that would support even a fragmentary claim of excuse or justification, or of a defense to homicide, because the victim here was prostrate and helpless when Walls returned to kill her. Beyond any reasonable doubt, the fourth element exists *389 here. Accordingly, the error in instructing the jury as to cold, calculated premeditation is harmless, because all four elements of this aggravator would exist under any definition. See DiGuilio.
In a related argument, Walls states that the jury was not adequately instructed on mitigating factors that may arise from mental disturbance, impairment, or duress. As to mental disturbance, Walls contends that the use of adjectives such as "extreme" or "substantial" may lead jurors to believe that less serious mental mitigation is precluded. This is true, Walls believes, even though the instructions tell jurors they may consider in mitigation any other aspect of the defendant's character or record.
Our law does establish that all evidence of mental disturbance or impairment is relevant if it may have some bearing on the crime or the defendant's character. Cheshire v. State, 568 So.2d 908 (Fla. 1990). Nevertheless, we do not find any error in denying the more detailed instruction Walls urges. The instruction on mitigating factors has been repeatedly upheld both in this Court and in the federal courts, and we reaffirm its validity today. Jurors clearly are told they may consider anything relevant. We also find no error in failing to instruct the jury as to the factor of extreme duress. The facts of the murder, as detailed in Walls' own confession and the other evidence, are inconsistent with any such claim.
As his fifth issue, Walls assigns error to the trial court's refusal to provide a more detailed interpretation of emotional disturbance as a mitigating factor. During deliberations, the jury sent written questions to the judge asking what "emotional disturbance" means, and whether the emotional disturbance may be present or preexisting. All parties agreed that "emotional disturbance" could not be further defined, so this question was left essentially unanswered. In response to the second question, the trial court simply reread the previously given instruction on the factor. We find no error in this response. The jury's question in effect asked for an interpretation of the law above and beyond what previously has been found acceptable in jury instructions; and there was no error in the instruction that would have required any modification.
Sixth, Walls argues that several other errors occurred in the trial court's findings on aggravating factors. Walls contends that the factors of heinous, atrocious, or cruel, and cold calculated premeditation were not proven beyond a reasonable doubt. The facts recited above, however, show otherwise. The murder of Peterson in this instance was protracted, torturous, and the product of a calculated design, coldly conceived through heightened premeditation, and executed without pretense of any justification.[5] These two factors exist beyond a reasonable doubt.
Walls also contends that the trial court erred during the penalty phase in concluding that the murder occurred during the commission of a burglary or kidnapping  another aggravator. In this vein, Walls argues that there was no evidence supporting a kidnapping for penalty-phase purposes; the jury was not instructed on kidnapping; and thus this factor could rest only on the commission of a burglary. Thus, appellant believes this factor impermissibly doubles another aggravating factor found here: that the murder was committed for pecuniary gain, which would be subsumed within the burglary aggravator.
Were we to accept Walls' initial premise, we agree that improper doubling would exist. However, we find that there was sufficient evidence of a kidnapping here: Walls was convicted of two counts of kidnapping because he forcibly confined Peterson against her will, without lawful authority, for the purpose of inflicting bodily harm and terrorizing his victim. See § 787.01, Fla. Stat. (1991). Moreover, the confinement here met the "asportation or confinement" requirement announced in Faison v. State, 426 So.2d 963, 965-66 (Fla. 1983), because: (a) the confinement *390 here was not slight, inconsequential, or merely incidental to the other crime; (b) it was not inherent in the nature of the other crime; and (c) it made the other crime substantially easier to commit or lessened the risk of detection. Id. at 965. There is no error in the fact that the penalty-phase jury was not instructed on kidnapping. See Ruffin v. State, 397 So.2d 277 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981).[6]
Walls next argues that the trial court erred in finding another aggravating factor: that the murder was committed to avoid arrest. However, this factor properly exists if the dominant motive of the murder was to eliminate a witness. See Knowles v. State, 632 So.2d 62 (Fla. 1993). Here, Walls' own confession stated that he killed Peterson because he wanted no witnesses. A confession is direct evidence in Florida. Hardwick v. State, 521 So.2d 1071 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 185, 102 L.Ed.2d 154 (1988); Michael v. State, 437 So.2d 138 (Fla. 1983), cert. denied, 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984). Therefore, this argument is without merit because it is directly refuted by the record and Walls' own words. For much the same reason, we also do not agree that Walls' "motive" was based on some mental derangement, not witness elimination. The facts of the killing as well as Walls' confession indicate otherwise, and the expert opinion testimony on this point is equivocal at best.[7]
As his seventh issue, Walls argues that the trial court erred by requiring him to prove mitigating factors by a preponderance of the evidence. Walls cites to language in opinions such as Nibert v. State, 574 So.2d 1059 (Fla. 1990), that mitigating factors must be found if they are "reasonably established" in the record. Nibert and other cases, however, add the condition that the factors must be "reasonably established by the greater weight of the evidence." Id. at 1061 (quoting Campbell v. State, 571 So.2d 415 (Fla. 1990)). "Greater weight" is the equivalent of "preponderance," because both simply mean "that which is more probable." See Boyd v. Gosser, 78 Fla. 64, 82 So. 758 (1918). This argument has no merit.
Eighth, Walls contends that the trial court improperly rejected expert opinion testimony that he was suffering extreme emotional disturbance and that his capacity to conform his conduct to the law's requirements was substantially impaired. In Florida as in many states, a distinction exists between factual evidence or testimony, and opinion testimony. As a general rule, uncontroverted factual evidence cannot simply be rejected unless it is contrary to law, improbable, untrustworthy, unreasonable, or contradictory. E.g., Brannen v. State, 94 Fla. 656, 114 So. 429 (1927). This rule applies equally to the penalty phase of a capital trial. Hardwick, 521 So.2d at 1076.
Opinion testimony, on the other hand, is not subject to the same rule. Brannen. Certain kinds of opinion testimony clearly are admissible  and especially qualified expert opinion testimony  but they are not necessarily binding even if uncontroverted. Opinion testimony gains its greatest force to the degree it is supported by the facts at hand, and its weight diminishes to *391 the degree such support is lacking. A debatable link between fact and opinion relevant to a mitigating factor usually means, at most, that a question exists for judge and jury to resolve. See Hardwick, 521 So.2d at 1076. We cannot conclude that the evidence here was anything more than debatable.[8] Accordingly, this Court may not revisit the judge and jury's determination on appeal.
As his ninth and final issue, Walls argues that the death penalty is not proportionate here, and he cites cases such as Fitzpatrick v. State, 527 So.2d 809 (Fla. 1988). Our review of this Court's case law, however, shows no comparability between the present case and others in which the death penalty has been found disproportionate. Fitzpatrick, for example, involved a bizarre robbery scheme by an immature and emotionally disturbed young man who impulsively fired his weapon when surprised by a police officer.
The present case, on the other hand, is little better than the execution-style slaying of a helpless woman who already had been bound and gagged, who had been terrorized by hearing her boyfriend's murder, who was helpless and in tears, and who obviously posed no threat whatsoever to Walls. The case for mitigation here unmistakably is of far lesser weight than that for aggravation, and we believe it would be so under any reasonable construction of the case for mitigation.
Accordingly, death is proportionate here. We say so having reviewed the entire record for any other possible errors. Having found none, the judgment and sentences are affirmed.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW and HARDING, JJ., concur.
McDONALD, Senior Justice, concurs specially with an opinion, in which OVERTON, J., concurs.
McDONALD, Senior Justice, specially concurring.
I concur with all parts of the majority opinion except its rejection of the state's argument that Jackson v. State, 1994 WL 137914, 19 Fla. L. Weekly S215 (Fla. April 21, 1994), was wrongly decided. To the extent that it held that the standard jury instruction on the cold and calculated aggravating factor was constitutionally infirm, Jackson was wrongly decided.
OVERTON, J., concurs.
NOTES
[1] Because of the prior trial result, double jeopardy precluded the possibility of a death penalty for the murder of Alger on retrial. Art. I, § 9, Fla. Const.
[2] The final jury consisted of four blacks and eight whites. Of the twelve, eight were women and four were men.
[3] The State primarily relies on Arave v. Creech, ___ U.S. ___, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993), in challenging Jackson v. State, 1994 WL 137914, 19 Fla. L. Weekly S215 (Fla. April 21, 1994). However, Arave dealt with facts vastly different from those in Jackson. The Arave Court confronted a self-confessed serial killer who had admitted murdering at least twenty-six people in seven states. Moreover, the conviction in Arave occurred in Idaho, a state that does not allow any jury involvement in the sentencing hearing, which is conducted entirely before the trial court. Also, the aggravating factor at issue in Arave  that the murder "exhibited utter disregard for human life"  had been the subject of an extensive limiting construction placed on it by the Idaho Supreme Court. Arave, ___ U.S. at ___, 113 S.Ct. at 1539 (quoting State v. Osborn, 102 Idaho 405, 631 P.2d 187 (Idaho 1981). The limiting construction imposed by the Idaho Supreme Court essentially is in harmony with the requirements of Jackson; and the clarification made by Jackson clearly is necessary because both judge and jury actively participate as cosentencers during the Florida penalty phase. Only the jury instruction was found unconstitutional in Jackson, unlike in Idaho where no jury is present to be instructed; and the sole issue in Arave was the aggravating factor itself, which was not the case in Jackson.
[4] "Colorable" means "that which is in appearance only, ... having the appearance of truth." Black's Law Dictionary 265 (6th ed. 1991). "Appearance" means there must be at least some basis in fact to support the defendant's belief that the killing would be excusable, justifiable, or subject to a legal defense. Of course, we are not dealing here with delusional defendants, as in Santos, whose internal distortion of reality more properly is relevant to the "coldness" element.
[5] While the trial court may have unduly emphasized Walls' preparation for the burglary in finding cold calculated premeditation, the judge's findings nevertheless also note the facts showing Walls' preparations for killing Peterson. The latter sufficiently support the trial court's findings.
[6] We do not agree with Walls' assertion that Ruffin has been undermined by Espinosa v. Florida, ___ U.S. ___, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). The latter dealt with jury instructions that were constitutionally invalid, not with minor differences between constitutionally valid instructions and the trial court's findings.
[7] It is perhaps true that some aspects of psychological science today treat criminal predisposition or criminal intent as a mental derangement. The law, however, is more exacting. "Mens rea" (or guilty mind) is the keystone of the law on homicide, because it is the measure of social blameworthiness. In the penalty phase of a capital trial, we have held that mental derangement may be relevant if it lessens or eliminates the weight of one of the heightened intent aggravators, which themselves gauge a kind of "heightened mens rea." Santos v. State, 591 So.2d 160, 163 (Fla. 1991). However, the purported "derangement" is irrelevant if it consists of nothing more than the aggravating factor itself. Any other holding would create an exception that completely swallows the rule. The evidence in this case establishes beyond a reasonable doubt that Walls possessed the heightened mens rea necessary for intent aggravators. The expert testimony to the contrary is too tenuous and too poorly supported by the facts to detract from the judge and jury's decision to impose death.
[8] Reasonable persons could conclude that the facts of the murder are inconsistent with the presence of the two mental mitigators. Moreover, all the experts hedged their statements, gave equivocal responses, or responded to questions that themselves were equivocal. The psychiatrist said he could not testify as to Walls' state of mind at the time of the murder. One psychologist responded yes to a question that essentially only asked whether Walls was suffering any impairment at the time of the murder. The facts may be consistent with some degree of emotional impairment, which the trial court surely recognized in finding emotional handicap and brain dysfunction as nonstatutory mitigators. Nevertheless, the expert testimony does not address the true problem here: the relative weight of mitigators versus aggravators. On the whole, the facts are consistent with the conclusion that any impairment Walls suffered was nonstatutory in nature and, in any event, was of far slighter weight than the aggravating factors found to exist.