[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 28, 2011
JOHN LEY
CLERK

_____

No. 09-15706

_____

D. C. Docket No. 06-00237-CV-MCR-MD

FRANK A. WALLS,

Petitioner-Appellant,

versus

EDWIN G. BUSS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(September 28, 2011)

Before DUBINA, Chief Judge, EDMONDSON and WILSON, Circuit Judges.

PER CURIAM:

Petitioner Frank Walls ("Petitioner"), a Florida death-row inmate, appeals the district court's denial of his section 2254 petition for a writ of habeas corpus. Under the deferential standard set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Petitioner is entitled to no relief. We affirm the district court's denial of the writ.

## I. BACKGROUND

In 1987, Petitioner burglarized a home and murdered the two people inside, Edward Alger and Ann Peterson. Following his arrest, Petitioner gave a statement to the investigators; this statement was recorded. During this statement, an investigator asked Petitioner several times whether he had sex with Peterson before killing her; each time Petitioner answered that he did not know. Petitioner ultimately was not charged with a sexual crime.

At trial, the State played for the jury the entire recorded statement (without objection from defense counsel). Petitioner was convicted of felony murder for Alger's death, and both felony murder and premeditated murder for Peterson's

death. The jury recommended life imprisonment for the murder of Alger, and -- by a seven-to-five vote -- a death sentence for the murder of Peterson; the trial court accepted these recommendations. On direct review, the Florida Supreme Court reversed Petitioner's convictions because of violations the State committed in investigating Petitioner; the court remanded for a new trial. Walls v. State, 580 So. 2d 131, 135 (Fla. 1991) ("Walls I").

There was a second trial. During jury selection for Petitioner's retrial, the State used a peremptory challenge to strike DG, a 24-year-old black man. Petitioner's trial counsel objected to this peremptory challenge (among others); about DG, the prosecutor responded that he had exercised the peremptory challenge because DG was roughly the same age as Petitioner, had expressed some opposition to the death penalty, and also because the prosecutor "personally sensed some hostility" in DG. The trial court upheld the peremptory challenge.[1]

Petitioner was again convicted of felony murder for Alger's death, and felony murder and premeditated murder for Peterson's death. Petitioner again received life imprisonment for Alger's death,[2] and the jury recommended a death

---

[1] Four black jurors served on the jury for Petitioner's retrial.

[2] Because the jury -- in Petitioner's first trial -- had acquitted Petitioner of the death penalty for Alger's death, double jeopardy precluded the second jury from considering the death sentence for that particular crime (but not for Peterson's death) on retrial. Walls v. State, 926 So. 2d 1156, 1173 (Fla. 2006) ("Walls III").

sentence -- this time unanimously -- for Peterson's death; the trial court accepted these recommendations.

Petitioner raised a number of issues on direct review, including an equal-protection claim based on the peremptory challenge the State exercised against DG. The Florida Supreme Court rejected all of Petitioner's arguments and affirmed his convictions and sentences. Walls v. State, 641 So. 2d 381, 391 (Fla. 1994) ("Walls II").

Later, Petitioner filed a motion for state-court post-conviction relief. See FLA. R. CRIM. PRO. 3.850. Among other things, Petitioner claimed that his trial lawyers -- both at the guilt phase and the penalty phase -- were ineffective for failing to exclude the investigator's questions about sexual assault from the recorded statement played for the jury. The state trial court conducted an evidentiary hearing on this issue; during this hearing the court heard testimony from Petitioner's guilt-phase and sentencing-phase lawyers. After this evidentiary hearing, the trial court rejected Petitioner's ineffective-assistance claim as well as all of his other claims; the Florida Supreme Court affirmed the denial of 3.850 relief and also denied Petitioner's application for a writ of habeas corpus. Walls III, 926 So. 2d at 1181.

Petitioner then filed a petition for a writ of habeas corpus in federal district

4

court. The district court denied the petition in a 134-page order, but the court granted Petitioner a certificate of appealability ("COA") on two issues:

> (1) whether trial counsel was ineffective in failing to file a motion in limine to seek redaction of the portions of Petitioner's confession referencing a possible sexual battery on victim Ann Peterson, and

> (2) whether the State's use of a peremptory challenge to exclude prospective juror [DG] constitutes a violation of Batson v. Kentucky, [106 S. Ct. 1712] (1986).

## II. DISCUSSION

In examining the district court's denial of habeas relief, we review factual findings for clear error and review questions of law and mixed questions of law and fact de novo. Johnson v. Sec'y, DOC, 643 F.3d 907, 929 (11th Cir. 2011).

Our review is also constrained by AEDPA, which provides that, in reviewing a state prisoner's habeas claims that have already been considered and rejected by a state court, we cannot grant relief unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

5

## A. Ineffective Assistance

Petitioner claims that he received the ineffective assistance of counsel. To prevail on an ineffective-assistance claim, Petitioner first "must show that counsel's performance was deficient" -- that is, "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland v. Washington, 104 S. Ct. 2052, 2064 (1984). Second, Petitioner "must show that the deficient performance prejudiced the defense" -- that is, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 2064, 2068.

In reviewing ineffective-assistance claims under AEDPA, the question before us is not whether Petitioner's lawyers' performance fell below the Strickland standard, but instead "whether the state court's application of the Strickland standard was unreasonable." Harrington v. Richter, 131 S. Ct. 770, 785 (2011).

Petitioner's argument is that his guilt-phase and penalty-phase trial lawyers

6

were ineffective for failing to exclude the references to a possible sexual crime from the recorded statement that was played for the jury.[3] At the evidentiary hearing that the Florida trial court held on this issue, Petitioner's guilt-phase counsel testified that he

> simply felt that it was better to give the impression to the jury that we weren't trying to hide anything and that everything was going to come out, and that [Petitioner], during his discussions, was being truthful, was being as honest as he could, and that it would become clear during the trial to the jury that regardless of [the investigator's questions about a sexual battery], there was no evidence a sexual battery or a rape either was intended or actually completed.

Petitioner's sentencing-phase counsel also testified at the evidentiary hearing; this lawyer explained that the recorded statement was "a huge part of our strategy" for both the guilt phase and the penalty phase, because it supported the defense theory of "a burglary gone awry." Sentencing-phase counsel explained that the point in the recorded statement at which Petitioner was asked about a sexual battery

> is when he begins to sob and cry and becomes uncertain, but he says "I don't know," and as far as him admitting a

---

[3] Petitioner also argues that his trial counsel was ineffective for failing to object to a crime scene investigator's testimony at trial about using a sexual battery kit to collect blood and saliva samples from Petitioner. But this issue was not included within the COA granted by the district court, and so we will not consider it. See 28 U.S.C. § 2253(c); Murray v. United States, 145 F.3d 1249, 1250-51 (11th Cir. 1998).

7

sexual battery or anything, he didn't, and our argument to the jury was that, in fact, he didn't admit to that, and that didn't happen, and of course, you know, I think I also argued that the "I don't know" was evidence of his confusion and his emotional distress at that point in time that would be indicative of remorse which was part of our penalty phase mitigation.

After hearing this testimony the Florida trial court concluded that Petitioner's trial lawyers had not performed deficiently. The Florida Supreme Court agreed, concluding that "[t]he record clearly supports the trial court's conclusion that counsel made a tactical decision not to redact [Petitioner's] taped confession because the tape in its entirety helped prove the defense's theory of the case." Walls III, 926 So. 2d at 1166.

The Florida Supreme Court's ruling that Petitioner has not shown ineffective assistance is reasonable. We first note that both Petitioner's guilt-phase and penalty-phase lawyers, at the time of Petitioner's retrial, had experience in capital cases: guilt-phase counsel had tried eight to ten capital cases, and penalty-phase counsel had tried five to seven capital cases (including one case in which he handled the penalty phase).

We begin with the "strong presumption" that counsel's conduct was reasonable, Strickland, 104 S. Ct. at 2065; and that presumption is even stronger when we examine the performance of experienced counsel. Chandler v. United

8

States, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc).

We also accept that the trial lawyers' decision not to challenge the references to a sexual crime was part of a broader plan of being forthcoming with the jury. The Florida Supreme Court found "clear[] support" in the record establishing that the lawyers' decision was a tactical one. Walls III, 926 So. 2d at 1166. That court's decision on this issue -- a question of fact -- is presumptively correct, Ferrell v. Hall, 640 F.3d 1199, 1223 (11th Cir. 2011), and Petitioner has offered no evidence to rebut that determination, much less the clear and convincing evidence that AEDPA requires when we review state courts' factual findings. 28 U.S.C. § 2254(e)(1). Given that the Florida Supreme Court had before it the sworn testimony of Petitioners' two lawyers, both agreeing that their decision was a tactical one, we cannot say that that court's factual determination was unreasonable.

Further, we consider the trial lawyers' plan a reasonable one. Chandler, 218 F.3d at 1314 n.14 ("[A] court must not second-guess counsel's strategy."). Openness in a jury trial is a move that can pay off. We have previously recognized the reasonableness of being forthcoming with the jury. See Straight v. Wainwright, 772 F.2d 674, 681 (11th Cir. 1985) (counsel was not ineffective for failing to object to a question on cross-examination, where counsel was pursuing a

9

plan of being "truthful and open" with the jury). Moreover, we have recognized that it can be reasonable to let incriminating evidence come to the jury's attention. See Atkins v. Singletary, 965 F.2d 952, 960 (11th Cir. 1992) (in a prosecution for the kidnapping, sexual battery, and murder of a six-year old boy, counsel was not ineffective for allowing prosecutors to put into evidence the male defendant's confession to sexual relations with 45 boys and young men, where counsel's plan was to "bring into play [the defendant's] sexual proclivities").

Here, the lawyers' openness was particularly reasonable given that the jurors knew they were not trying Petitioner for a sexual crime against Peterson. This openness -- with potential risks but also potential rewards -- was exactly the sort of decision Strickland allows lawyers to make.[4]

Petitioner has pointed to no Supreme Court precedent establishing that the Florida Supreme Court's decision -- that Petitioner's trial lawyers had performed well enough -- was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of

---

[4] The trial lawyers had the advantage of having seen how their open approach worked during Petitioner's first trial. Given that the jury in that first trial had recommended a death sentence by a vote of 7-5 -- one vote shy of resulting in a recommendation of life-imprisonment -- Petitioner's lawyers could reasonably have believed that pursuing the same course at the retrial was Petitioner's best hope for avoiding a death sentence.

10

the facts.[5]


## B.  Peremptory Challenge


Petitioner also contends that the State improperly used a peremptory challenge to remove a black juror, DG, based solely on that juror's race.[6]  During the prosecutor's questioning of DG, the following exchange took place:

> Prosecutor: . . . . Could you base your decision on what you hear as aggravation and mitigation, or do you have some feelings about the death penalty that make you reluctant to vote for the death penalty?
>
> DG:  No, I can't just walk in here and say kill him until I hear the evidence.
>
> Prosecutor:  Well, nobody would ask you to do that, and that's not going to be the way it works. What we really want to know is, based on who you are and the family you were raised in and where you went to school and what you've read in the paper and what you've seen on television, do you have a feeling about the death penalty that makes you wonder whether it's the right thing to do or not?
>
> DG:  Sometimes.
>
> Prosecutor:  Sometimes. What makes you wonder about it?
>
> DG:  Just whether they were really guilty or not.

[5] Because we accept the Florida Supreme Court's conclusion that trial counsel had not performed deficiently, we do not reach the question of whether the lawyers' performance prejudiced Petitioner.

[6] Petitioner has standing to assert this claim although he is white (as were both of his victims). <u>Powers v. Ohio</u>, 111 S. Ct. 1364, 1373 (1991).

Prosecutor:  So, your main concern is it's final, and you want to make sure the person's guilty or not.

DG:  Right.

Prosecutor:  Let's suppose for argument that you're convinced of guilt beyond a reasonable doubt, and then you go to the penalty phase. Would you be reluctant to vote for the death penalty then if the aggravation outweighed the mitigation? If it was worse than it was not so bad, would you vote for the death penalty?

DG:  Yes.

Prosecutor:  Do you believe there's a place for the death penalty in our society?

DG:  Yes.

Prosecutor:  If we had a chance to do away with it, and we had a referendum, would you vote for it or against it?

DG:  I'd vote against it if there was another way around it.

Prosecutor:  You'd vote against it. You'd rather we didn't have a death penalty then.

DG:  It depends on, like I said, if I felt he was really guilty.

Court:  I don't know if he understood what you meant by a referendum. I think if you'll go over that once again.

Prosecutor:  Instead of letting the Legislature decide for us whether we were going to have a death penalty or not, suppose we let the people decide. Based upon what you know and what you've heard, where you've been and everybody you've ever talked to about it and read about it in the newspapers, and you had a chance to vote whether this country or state should have a death penalty, would you be more likely to vote for or against it?

DG:  Probably vote for it, I'm not sure.

12

Prosecutor: That's all I have, Your Honor.

Defense counsel: [DG], I understood you to say that you would vote against it if there was a way around it, is that what you said?

DG: Yes, sir.

Defense counsel: But not seeing a way around it, you would be compelled to vote for it.

DG: Yes.

Court: . . . I don't think he understood what he was talking about at that point was referendum. I think he meant he was talking about a trial.

Defense counsel: Is that what you thought, [DG]?

DG: Before he explained it again, that's what I thought.

When defense counsel later objected to the State's peremptory challenge against DG, the prosecutor explained that

[DG] is twenty-four years old, and he is not the same age as the defendant, but that's a consideration. I have struck a number . . . who are approximately the same age as the defendant. The reason I'm doing that is because, obviously, and they're white, but they might identify with this defendant merely because of his age, and I think that's a perfectly proper peremptory challenge, and it is race neutral. In addition to that, when questioning [DG] concerning what he thought about the death penalty, his first answer was to the effect that if there was another way out of it, he would not vote for the death penalty. Later on he later said that he could vote for the death penalty, but that first answer, combined with his age, and I'll tell the Court another thing. I personally sensed some hostility in that person. I may be dead wrong, but it wouldn't matter if he was black or white, I didn't want somebody on the jury that I sensed that kind of hostility from.

The state trial court permitted the peremptory challenge. On direct appeal,

13

the Florida Supreme Court noted that DG "had expressed discomfort with the death penalty," and concluded that this discomfort was "a sufficient race-neutral reason for the State to exercise its peremptory." Walls II, 641 So. 2d at 386. So, the Florida Supreme Court rejected Petitioner's claim on this issue.

The believability of a prosecutor's race-neutral explanations for striking a juror is a "pure issue of fact . . . peculiarly within a trial judge's province." McNair v. Campbell, 416 F.3d 1291, 1310 (11th Cir. 2005) (internal quotation marks and citation omitted). In addition, under AEDPA we presume the correctness of the state court's factual determinations; Petitioner bears the burden of rebutting this presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Petitioner has not carried this burden, and so we cannot say that the Florida Supreme Court unreasonably accepted the State's race-neutral explanation for striking DG. When asked whether he "ha[d] a feeling about the death penalty that makes you wonder whether it's the right thing to do or not," DG answered, "Sometimes." And he seemed to express further hesitation about capital punishment when he was asked whether he would support a referendum against the death penalty.[7] The Florida Supreme Court thus had a sound basis for determining

_____

[7] We see some lack of clarity on whether DG understood the questions about a referendum: some of DG's responses might be understood as indicating that he would prefer to vote either

14

that DG had "expressed discomfort with the death penalty," and Petitioner has not offered the clear and convincing evidence required to overcome our presumption that this factual determination is correct.

Nor was the Florida Supreme Court's decision contrary to, or an unreasonable application of, federal law. Even if we assume that Petitioner has made the required prima facie showing of racial discrimination -- see Batson v. Kentucky, 106 S. Ct. 1712, 1723 (1986) -- we accept the State's race-neutral explanation that was based on Petitioner's opposition to the death penalty. "[C]learly established federal law, as determined by holdings in Supreme Court decisions, does not prohibit prosecutors from using their peremptory strikes to remove venire members who are not ardent supporters of the death penalty . . . ." Bowles v. Sec'y for Dep't of Corr., 608 F.3d 1313, 1317 (11th Cir. 2010). Nothing pertinent to the law has changed since Bowles was decided: no United States Supreme Court precedent establishes a basis for challenging the Florida Supreme Court's decision in this case.

Moreover, Petitioner has failed to offer evidence -- for example, a

---

against the death penalty in a given case, or against a referendum wholly eliminating the death penalty. But this lack of clarity actually makes it harder for us to say that the Florida Supreme Court reached an unreasonable determination of the facts in finding that DG had "expressed discomfort with the death penalty." Walls II, 641 So. 2d at 386. Where, as here, the record might be read as supporting multiple conclusions, it would be error for us to substitute our view of the facts for that of the Florida Supreme Court. See Wainwright v. Goode, 104 S. Ct. 378, 382-83 (1983).

15

comparative analysis of jurors who the State accepted and rejected, to show that the State did not attempt to remove similarly situated nonblack jurors -- even suggesting that the prosecutor's race-neutral explanation was merely pretextual. Petitioner, in short, is unable to establish purposeful discrimination. The Florida Supreme Court's decision rejecting Petitioner's <u>Batson</u> claim was neither contrary to, nor an unreasonable application of, federal law as determined by the United States Supreme Court.[8]

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of habeas relief for Petitioner.

AFFIRMED.

---

[8] Because we conclude that DG's expressed opposition to the death penalty was a permissible basis for the State's peremptory challenge, we need not consider the other reasons the prosecutor offered for striking DG -- his age and the hostility that the prosecutor claimed to sense in DG – except to say that Petitioner has offered nothing to show that either reason was a pretext for racial discrimination.