504 So.2d 396 (1987)
Michael Scott KEEN, Appellant,
v.
STATE of Florida, Appellee.
No. 67384.
Supreme Court of Florida.
March 19, 1987.
*397 Michael D. Gelety, Fort Lauderdale, for appellant.
Robert A. Butterworth, Jr., Atty. Gen., and Carolyn V. McCann, Asst. Atty. Gen., West Palm Beach, for appellee.
EHRLICH, Justice.
The appellant, Michael Scott Keen, appeals his conviction for first-degree murder and his sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We reverse and remand for a new trial.
The evidence against Keen adduced at trial was primarily based on the testimony of Ken Shapiro. When Shapiro first moved to Florida in 1978 he was hired by Keen to work for a company managed by Keen. Shortly thereafter Keen invited Shapiro to become his roommate, a relationship which continued, with one brief interruption, until at least the end of 1981. Keen was very generous financially to Shapiro, providing him with numerous small loans and helping him out with rent and food; at one point Keen provided Shapiro with a Cadillac. There was no discussion that Shapiro was to repay Keen. According to Shapiro, some time in 1980 Keen informed him that he wished to retire before the age of forty and that the easiest way to accomplish this would be to find an unsuspecting girl, marry her, insure her life, murder her and then invest the proceeds. Keen met the victim, Anita Lopez, in late summer of 1980. Lopez was then twenty-one years old, Cuban born and worked in a tractor factory. After Keen began seeing Lopez regularly, he told Shapiro, "I feel Anita is the girl." Shortly thereafter, Lopez moved in with Keen and Shapiro at their Ft. Lauderdale home. By early 1981 Keen began to discuss with Shapiro the actual manner in which his plan could be accomplished. Keen's first suggestion was to push the *398 victim off a high building, but eventually drowning was decided upon. In June 1981, two separate insurance policies were taken out each insuring Anita Lopez's life for $50,000. Both policies contained double indemnity provisions in case Lopez met an accidental death and both policies named Keen as the primary beneficiary.
Keen and Lopez were married on August 1, 1981. Shortly thereafter it was discovered that Lopez was pregnant which, according to Shapiro's testimony, forced Keen to accelerate the implementation of his plan. Shapiro testified that Keen threatened to kill him or his grandparents if he went to the authorities. Shapiro further testified that he felt "boxed in" and so remained quiet and did not tell anyone of Keen's plan. Keen allegedly told Shapiro that this would be Shapiro's way of repaying his debt to Keen and to "wipe the slate clean."
In late October or early November of 1981. Keen informed Shapiro that if Sunday November 15 was a nice day, he would proceed with the plan. Sometime in the late morning or early afternoon of the 15th, Keen and the victim left their canalfront home and traveled in Keen's boat, the Foreplay Too, through the intercoastal waterway. By prearrangement, Keen and the victim stopped at a waterfront bar, Tug Boat Annie's; shortly thereafter, Shapiro arrived at the bar. After spending some period of time there the three boarded the boat and headed out into the ocean. When the boat was approximately fifteen to eighteen miles out, Keen, who had been driving, put the boat in neutral, walked to where the victim was standing and pushed her from behind into the ocean. Keen told Shapiro to move the boat out of the victim's range; Keen took over the controls and kept the boat out of the victim's range. According to Shapiro, the plan was to actually watch the victim drown so that her body could be recovered and Keen could then collect the insurance proceeds. However, darkness set in and Shapiro and Keen lost sight of the victim. They returned to Keen's backyard dock whereupon Shapiro called the Coast Guard and the Broward County Sheriff's office. Keen gave statements to the authorities that at some point the victim, who was four to five months pregnant at the time, went down into the cabin below to rest and that when they returned home, she was not there. A week later Shapiro gave a sworn statement to the sheriff's office corroborating Keen's version of an unexplained accident. Shapiro also repeated the story to an attorney hired by Keen to initiate the insurance claims process.
The next time Shapiro gave a statement concerning these events was in August 1984 when he was approached by detectives from Broward County.[1] In this statement Shapiro related the same version of events that he later testified to at trial. Following Shapiro's August 1984 statement Broward County Detectives Scheff and Amabile located Keen who was living under an assumed name in Seminole County. Keen was arrested on August 23 at his place of business and was returned to Broward County on August 24.
Following a trial before a Broward County jury Keen was convicted of first-degree murder. The trial judge followed the jury's unanimous recommendation and imposed the sentence of death.
Keen's first claim here is that Florida is without jurisdiction to try him for this murder. According to Keen's theory, because the murder was committed on the high seas outside Florida's territorial jurisdiction, the federal government has exclusive jurisdiction to try him for this crime by virtue of 18 U.S.C. § 7. We disagree. Our decision in Lane v. State, 388 So.2d 1022 (Fla. 1980), controls. In Lane we were faced with the factual situation wherein the *399 charged offense, first-degree murder, was commenced in Florida and concluded in Alabama. Recognizing that the fatal blow to the victim was probably struck in Alabama, we held that pursuant to section 910.005(2), Florida Statutes (1977), Florida had jurisdiction to try the defendant. Id. at 1026. We reasoned that when one of the essential elements of the offense occurs in Florida, Florida courts have the power to try the defendant; whether an essential element of the offense occurred within the state is a factual question to be determined by the jury under appropriate instructions. Id. at 1028. Sub judice, it is clear from the record that the essential element of premeditation occurred within Florida. The jury was properly instructed by the trial court that in order to return a verdict of guilty, they must find that an essential element of the crime occurred within the state. Keen attempts to avoid our holding in Lane by alleging that Lane is applicable only in cases involving conflicting jurisdictional claims between states. As this case theoretically involves a claim between Florida and the federal government,[2] Keen argues that the federal courts have exclusive jurisdiction. However, none of the cases cited by Keen suggests such exclusive jurisdiction. Indeed, the cases cited all recognize that concurrent jurisdiction exists between a state and the federal government where the offense violates both sovereigns' laws. See, e.g., Leonard v. United States, 500 F.2d 673, 674 (5th Cir.1974); Hoopengarner v. United States, 270 F.2d 465, 471 (6th Cir.1959); Murray v. Hildreth, 61 F.2d 483, 485 (5th Cir.1932).
The next issue which we choose to address is that a statement Keen gave to the arresting detectives should have been suppressed. We reject this contention and find the trial court's denial of Keen's motion to suppress was proper. Keen was arrested in Seminole County on August 24 at approximately 10 a.m. and was read his Miranda[3] rights. He was booked at the Seminole County Detention Center at approximately 2 p.m. where he was again advised of his rights which he acknowledged in the booking form. Although Keen had upon his initial arrest asked an employee to contact an attorney for the purpose of seeking bail, Keen initiated conversations with the detectives throughout the remainder of the day. At 8 a.m. the next morning Keen was again informed of his rights before Detectives Amabile and Scheff began transporting him by car back to Broward County. Keen again initiated conversations with the detectives during this trip. They arrived in Broward County at approximately 12:30 p.m. whereupon Keen was advised of his rights for the fourth time; he also signed a waiver of rights form which was witnessed by both detectives. Keen desired to give the detectives a statement but did not want it tape recorded. Detective Amabile wrote out in question and answer form the contents of the conversation he had just had with Keen. Although he refused to sign the statement, Keen made additions to and corrections in the statement. In this handwritten statement Keen claimed that he and the victim had been embracing by one of the boat's railings when Shapiro came up from behind and pushed Keen and Lopez overboard. According to this account, Keen did not see the victim once he was in the water and speculated that she must have hit her head on the diving platform. Keen also claimed to have gotten back on board the boat, which was traveling in circles at a speed of ten knots, by "leading" the boat and grabbing the dive platform in order to hoist himself back on board. Once Keen was again on board and driving, they searched for the victim until darkness set in. Keen also told the detectives that he went along with Shapiro's original version of the events because he did not want Shapiro to appear to be a liar.
Keen urges three reasons why his statement should have been suppressed. First, he claims that pursuant to Rule of *400 Criminal Procedure 3.130, which requires an arrested person to be taken before a judicial officer within twenty-four hours of arrest, any statement made in violation of the rule must be suppressed. Keen points out that the statement at issue here was made more than twenty-four hours after his arrest. While a violation of the rule has been shown, we reject Keen's suggestion that an otherwise voluntary statement given after twenty-four hours is per se inadmissible. We agree with the reasoning expressed by the First District Court of Appeal in Headrick v. State, 366 So.2d 1190 (Fla. 1st DCA 1978), that each case must be examined upon its own facts to determine whether a violation of the rule has induced an otherwise voluntary confession. Id. at 1191. The court reasoned that when a defendant has been advised of his rights and makes an otherwise voluntary statement, the delay in following the strictures of the rule must be shown to have induced the confession. Id. See also Williams v. State, 466 So.2d 1246 (Fla. 1st DCA), review denied, 475 So.2d 696 (Fla. 1985). Sub judice, Keen was advised on his rights to remain silent and his right to counsel on four separate occasions and gave the statement at issue only after voluntarily signing a waiver of rights. Absent a showing that the delay induced this otherwise voluntary statement, we find that the trial court properly denied Keen's motion to suppress.
Keen's suggestion that our decision in Anderson v. State, 420 So.2d 574 (Fla. 1982), mandates that his statement be suppressed is unpersuasive. Anderson is clearly distinguishable as there the evidence presented to this Court showed that Anderson had been indicted prior to being taken into custody by Florida law enforcement officials who drove Anderson by car for four days from Minnesota back to Florida. The deputies were aware that Anderson had no counsel in Minnesota and that he desired appointed counsel once returned to Florida. Holding that Anderson's statement should have been suppressed, we found "significant" the fact that the statement at issue came "far after" Anderson should have been brought before a judicial officer "with the attendant advice of rights and appointment of counsel." Id. at 576. We also found that the record failed to show a valid waiver. Id. The facts sub judice stand in stark contrast. Keen was not indicted until after the statement was given to the detectives, he was advised on four separate occasions of his right to remain silent and his right to counsel, and he signed a waiver before giving the statement. It unequivocally appears from the record that Keen knowingly, intelligently and voluntarily waived his rights before making the statement.
We also reject Keen's claim that his statement should have been suppressed because it was elicited in violation of his fifth and sixth amendment rights. The record shows that upon being informed he was under arrest Keen asked one of his employees to call an attorney for him for the purpose of bail. This statement was made prior to Keen's initial advisement of Miranda and we do not view the statement as an invocation of Keen's fifth amendment rights. Even assuming that the statement was such an invocation, he never expressed to the detectives a desire to speak with counsel on any of the four occasions when he was advised of his rights, he initiated conversations with the detectives throughout this entire time, and signed a waiver of rights form. Pursuant to the dictates of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), Keen has failed to show a violation of his fifth amendment rights. See also Hoffman v. State, 474 So.2d 1178 (Fla. 1985); Cannady v. State, 427 So.2d 723 (Fla. 1983). Keen's sixth amendment claim fails because at the time the statement was made formal charges had not been filed against him and, therefore, adversary proceedings had not yet commenced. Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).
The final issue we address is the basis for our reversal and remand for a new trial. The state filed a pretrial Notice of Intent to Rely on Evidence of Another Crime, (i.e. Williams Rule Evidence, pursuant *401 to Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959)). The "other crime" was an incident which occurred in North Carolina in 1973 when allegedly Keen and his brother attempted to murder Keen's brother's wife by hitting her in the head with a rock. After hearing testimony from Shapiro and the alleged victim, the trial court reserved ruling on the matter, instructing the state that there would be no mention of this incident until there was a ruling. After the direct testimony of Shapiro at trial, the state again attempted to raise this issue, this time on the additional theory that Shapiro's knowledge of this incident would lend credence to his claim of being in fear of Keen. The trial court rejected this testimony, explicitly ruling that it was not going to be permitted at trial. Before the close of its case-in-chief the state again raised the subject with the trial court, again arguing both theories for admitting testimony concerning this incident. The court again specifically denied the state's request. After the close of the state's case, Keen testified on his own behalf and on direct examination admitted to a prior felony conviction. On cross-examination the prosecutor asked Keen: "Didn't you describe to Ken Shapiro how you and Patrick Keen had tried to beat Patrick Keen's wife to death with a rock in North Carolina in 1973?" The defense's motion for a mistrial was denied by the trial court. Keen claims that his motion for mistrial should have been granted because this improper question was so inflammatory and prejudicial that it destroyed Keen's right to a fair trial. We agree.
The trial court properly ruled that this incident was not Williams rule evidence and was, therefore, inadmissible. There is no doubt that this 1973 incident was devoid of the requisite similarities which would have made the evidence relevant, thus fitting it within one of the exceptions to the rule of exclusion set forth in Williams. See Drake v. State, 400 So.2d 1217 (Fla. 1981). When such irrelevant evidence is admitted it is "presumed harmful error because of the danger that a jury will take the bad character or propensity to crime thus demonstrated as evidence of guilt of the crime charged." Straight v. State, 397 So.2d 903, 908 (Fla.), cert. denied, 454 U.S. 1022, 102 S.Ct. 556, 70 L.Ed.2d 418 (1981). As we explained over a half a century ago:
Evidence that the defendant has committed a similar crime, or one equally heinous, will frequently prompt a more ready belief by the jury that he might have committed the one with which he is charged, thereby predisposing the mind of the juror to believe the prisoner guilty.
Nickels v. State, 90 Fla. 659, 685, 106 So. 479, 488 (1925).
The state here quite correctly concedes that the prosecutor's question was improper and should not have been asked, but seeks to avoid reversal by characterizing the evidence against Keen as "overwhelming" and that the error in asking this single question, therefore, was harmless. We disagree.
The properly admitted evidence produced at trial against Keen was sufficient to support a jury verdict of guilty. However, it would be legerdemain to characterize the evidence as overwhelming; the real jury issue presented in this trial centered on the credibility of Shapiro versus the credibility of Keen. While an improper question by a prosecutor may, in light of the overwhelming evidence of guilt and the nature of the question, be considered a harmless error, see, e.g., Straight, 397 So.2d at 909, the focus of harmless error analysis must be the effect of the error on the trier of fact:
Application of the [harmless error] test requires not only a close examination of the permissible evidence on which the jury could have legitimately relied, but an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict... . The question is whether there is a reasonable possibility that the error affected the verdict. The burden to show the error was harmless must remain on the state. If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful.
*402 State v. DiGuilio, 491 So.2d 1129, 1138-1139 (Fla. 1986).
The state has not met this burden here and we are unable to say beyond a reasonable doubt that the prosecutor informing the jury, albeit under the guise of a question, that Keen had previously attempted to murder his brother's wife had no impact on the verdict; indeed, commonsense would indicate to the contrary.[4]
There is perhaps no value more basic to our system of criminal justice than the right of every citizen accused of a crime to receive a fair trial before an impartial jury sworn to follow the law and decide the guilt or innocence of the accused based solely on the evidence produced at trial. The source of the improper information conveyed to the jury in this case is irrelevant: It was so prejudicial as to taint the reliability of the jury's verdict whether it came from a media account or from the prosecutor. During oral argument before this Court counsel for the state suggested that the remedy for this prosecutorial misconduct would be to refer the matter to The Florida Bar for disciplinary investigation as was suggested by this Court in State v. Murray, 443 So.2d 955 (Fla. 1984). While we do not deny the possibility that this action may be warranted in some instances, it leaves unresolved the question presented here. To an accused a bar disciplinary proceeding is no substitute for a fair trial.
Recently, in Robinson v. State, 487 So.2d 1040 (Fla. 1986), we were faced with a situation similar to the one sub judice. During the penalty phase proceedings, the prosecutor was allowed to ask various defense witnesses questions concerning crimes that Robinson had allegedly committed subsequent to the offense at issue and that Robinson had never been charged with. In finding this so prejudicial as to require resentencing before a new jury, we stated: "Hearing about other alleged crimes could damn a defendant in the jury's eyes and be excessively prejudicial. We find the state went too far in this instance." Id. at 1042. The state went too far in this case as well. It is noteworthy that the improper questions at issue in Robinson were asked during the penalty phase, wherein a character analysis of the defendant is contemplated and the rules of evidence are relaxed. In contrast, the prosecutor's question sub judice was posed during the guilt phase of Keen's trial, where proof of the particular crime charged is the standard that the law requires.
Because the prosecutor improperly placed prejudicial information before the jury which had no relevance except to show Keen's bad character and propensity for violence, Keen's right to a fair trial was compromised. In our system of criminal justice, one of the primary functions of the judiciary generally, and of this Court in capital cases specifically, is to ensure that the rights of the individual are protected. Harmful and prejudicial error having occurred below, we reverse and remand for a new trial.[5]
It is so ordered.
McDONALD, C.J., OVERTON, SHAW and BARKETT, JJ., and ADKINS, J. (Ret.), concur.
NOTES
[1] It appears that appellant's brother, Patrick Keen, contacted a representative of one of the companys who had insured Anita Lopez Keen's life, offering to tell the "true" story of her death in exchange for a finder's fee. The representative then contacted the Broward County authorities who in turn contacted Shapiro. At trial Shapiro explained that he finally told the truth about what had happened to the victim because his knowledge of the murder was devastating him and that he knew sooner or later he would have to tell someone. He further explained that he was testifying without immunity because he wanted to get the story off his chest.
[2] There has been no showing that the federal government has ever attempted to exert jurisdiction in this case.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] The prior felony conviction admitted to by Keen was not for this 1973 incident. The prosecutor's question therefore not only invited the jury to infer that the defendant acted in conformity with his propensity for killing young women, it also created the false impression that the defendant had been previously convicted of such an offense.
[5] We find no double jeopardy problem with a retrial of Keen arising from the prosecutorial misconduct here. In Oregon v. Kennedy, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), the United States Supreme Court held that for prosecutorial misconduct to be the basis for barring retrial under the double jeopardy clause, the prosecutor must intentionally "goad" the defense into requesting a mistrial; mere overreaching by a prosecutor is not enough. Id. at 676, 102 S.Ct. at 2089. In our view, the misconduct sub judice was engaged in by the prosecutor in the heat of trial in order to win his case, and was not done intentionally in order to afford the state "a more favorable opportunity to convict the defendant." Id. at 674, 102 S.Ct. at 2088.