660 So.2d 648 (1995)
Emanuel JOHNSON, Appellant,
v.
STATE of Florida, Appellee.
No. 78337.
Supreme Court of Florida.
July 13, 1995.
Rehearing Denied September 22, 1995.
*651 James Marion Moorman, Public Defender; and Stephen Krosschell and Robert F. Moeller, Asst. Public Defenders, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen. and Robert J. Landry, Asst. Atty. Gen., Tampa, for appellee.
KOGAN, Justice.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Emanuel Johnson. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
*652 On September 22, 1988, Sarasota police found Jackie McCahon's body on a sidewalk in front of her residence. She had been stabbed nineteen times, and twelve of the wounds were fatal. A broken-off piece of a knife blade was found in her body. Blood spatter evidence suggested that McCahon had been attacked as she opened the door, or while inside a bathroom. Police at first suspected several men, but later turned their attention to a tenant of McCahon's named Emanuel Johnson. When first questioned, Johnson said he had heard police cars arrive and had gone out to see what was happening, but that he did not know McCahon was the victim until someone told him so the next day.
After a lengthy police interrogation, however, Johnson confessed. He said he had gone to McCahon's residence to say he needed to use her phone because his wife was about to give birth. McCahon knew that Johnson's wife was pregnant. When McCahon let Johnson in the door, he grabbed her and choked her to semi-consciousness. Then he found a knife, stabbed her several times, cut the phone cord, then took twenty dollars he found. Later, Johnson stated that he then went across the street to his apartment, but saw McCahon stagger out of her residence on to the sidewalk. At this point Johnson said he took a knife from his apartment, went out, and stabbed McCahon repeatedly. Police later found a broken knife handle where Johnson said he had thrown the second knife. It matched the broken blade found in the body.
Johnson was found guilty at trial of first degree murder and armed burglary. The jury recommended death by a vote of 10-to-2. The trial court found the following aggravating factors: (1) prior violent felony; (2) murder committed for pecuniary gain; (3) the murder was heinous, atrocious, or cruel. The trial court found the following mitigating factors: (1) Johnson was raised by the father in a single-parent household; (2) He had a deprived upbringing; (3) He had an excellent relationship with other family members; (4) He was a good son who provided for his mother; (5) He had an excellent employment history; (6) He had been a good husband and father; (7) He showed love and affection to his two children; (8) He cooperated with police and confessed; (9) He had demonstrated artistic and poetic talent; (10) "The age of the Defendant at the time of the crime"; (11) Johnson "has potential for rehabilitation and productivity in the prison system"; (12) "The Court can punish the Defendant by imposing life sentences"; (13) Johnson had no significant history of criminal activity before 1988; (14) He exhibited good behavior at trial; and (15) He suffered mental pressure not reaching the level of statutory mitigation.
Initially, we address a procedural matter raised by the parties. Johnson's brief relies upon cross-referenced briefs and the record from another case now pending in this Court, Johnson v. State, 660 So.2d 637 (1995). The attempt to cross-reference a brief from a separate case is impermissible under any circumstances because it may confuse factually inapposite cases, it leaves appellate courts the task of determining which issues are relevant (which is counsel's role), and it circumvents the page-limit requirements. Id. As a general rule, cross-referencing of records is contrary to the holdings in Wuornos v. State, 644 So.2d 1012, 1019 (Fla. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1708, 131 L.Ed.2d 568 (1995), and in Jackson v. State, 575 So.2d 181, 193 (Fla. 1991). In Jackson, for example, we stated:
This Court decides cases solely based on the record under review. We must blind ourselves to facts not presented in this record.
We recognize that the lower court, in a spirit of judicial efficiency, combined hearings in Johnson's various cases. Moreover, we earlier granted a motion to take judicial notice of a portion of the record in Johnson's other death appeal, though in that portion the trial court actually was addressing an issue in the present case.
Nevertheless, this motion was granted before it became clear how extensively the two Johnson records pending in this Court have become intertwined. One result is that this Court is confronted with two very lengthy but separate records that both cross-reference each other (though obviously not to specific page numbers) and that the parties *653 have extensively cross-referenced in their briefs, in ways that at times are not entirely clear. We have read the entire record in both cases together and sua sponte have determined their relevance to one another. However, the intertwining of separate records evident here is not something to be encouraged.
Effective as of the date this opinion is released, we hold that the proper method of bringing relevant matters before this Court that are contained in separate records of pending cases is by way of a motion to supplement the record,[1] not by a request for the taking of judicial notice. In light of our prior order and the requirements of Rule of Appellate Procedure 9.200(f)(2),[2] we have read the two records together in this case and determined their relevance to one another. In the future, however, any attempt to cross-reference separate records of pending cases will constitute grounds for the opposing party to move to strike the cross reference under the holdings of Wuornos and Jackson. This Court likewise may strike such a cross reference sua sponte. Any order striking a cross reference shall constitute automatic notice to counsel that the record must be supplemented in keeping with rule 9.200(f)(2), and the failure to supplement then will work a procedural bar as to the matters at issue in the improperly cross-referenced material.
On the merits, Johnson's first argument is that the arrest warrant was defective on several grounds. In the proceedings below, the trial court found the underlying affidavit defective for failure to include a proper oath, though the State now argues the trial court erred in this regard. The parties agree that the affiant officer swore to the warrant before the issuing magistrate, but Johnson contends that the oath was invalid because it contained the reservation of truthfulness only "to [the officer's] best knowledge and belief" or "to the best of [the officer's] knowledge." Johnson argues that the reservation effectively shielded the officer from perjury prosecution for untruthful statements, thereby making the oath illusory.
Thus, the issue here is what constitutes a valid oath under the Warrant Clause of the Fourth Amendment, which states:
[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const. amend. IV. This general principle has been further illuminated by Court rule:
Each state and county judge is a committing magistrate and may issue a summons to, or a warrant for the arrest of, a person against whom a complaint is made in writing and sworn to before a person authorized to administer oaths, when the complaint states facts that show that such person violated a criminal law of this state within the jurisdiction of the magistrate to whom the complaint is presented.
Fla.R.Crim.P. 3.120.
Johnson principally relies on State v. Rodriguez, 523 So.2d 1141 (Fla. 1988), and Scott v. State, 464 So.2d 1171 (Fla. 1985), for the proposition that an affidavit including a reservation "to the best knowledge" is insufficient. However, these cases are readily distinguishable, because both dealt not with arrest warrants but with affidavits supporting trial pleadings. In Rodriguez and in Scott, the issue involved jurats containing the "best knowledge" reservation respectively attached to a motion to dismiss under Rule of Criminal Procedure 3.190(c)(4) and to a motion for postconviction relief filed under Rule of Criminal Procedure 3.850. In the instant case, the question was not the jurat attached to postconviction pleadings, but rather the jurat to an affidavit used to establish probable cause. Because the concept of probable cause is not relevant to the procedural constraints imposed on pleadings, the two cases *654 cited above are inapposite to our determination today.
Turning to the true issue, we find that it must be governed by the good-faith exception announced in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which is binding upon us under article I, section 12 of the Florida Constitution. Perez v. State, 620 So.2d 1256 (Fla. 1993). The pertinent holding of Leon was stated in the following terms:
It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient... . Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.
Leon, 468 U.S. at 921, 104 S.Ct. at 3419. This conclusion rests on the principle that the exclusionary rule is meant to deter abuses by law enforcement, not to use law enforcement as the whipping boy for the magistrate's error. Officers are not expected to possess a lawyer's understanding of the nuances of Fourth Amendment law. Nor are they permitted to second guess the validity of a facially sufficient warrant.
Any errors here clearly were technical and were committed solely by the magistrate, not by the officers. We hold that the officers acted in good faith and fall within the good-faith exception of Leon.
Even if this were not the case, we believe the "best knowledge" reservation would not itself render the affidavit defective in the present case. The object of the magistrate's review is the establishment of probable cause, not the meeting of some higher standard of proof. "Probable cause" means a reasonable ground of suspicion supported by circumstances strong enough in themselves to warrant a cautious person in belief that the named suspect is guilty of the offense charged. Dunnavant v. State, 46 So.2d 871 (Fla. 1950). Unlike the burdens of proof in a criminal trial, the obligation to establish probable cause in an affidavit may be met by hearsay, by fleeting observations, or by tips received from unnamed reliable informants[3] whose identities often may not lawfully be disclosed, Franks v. Delaware, 438 U.S. 154, 167, 98 S.Ct. 2674, 2682, 57 L.Ed.2d 667 (1978), among other reasons. Under the fellow-officer rule, information shared by officers investigating a crime is imputed to any one of their number, even those from different agencies working together. Polk v. Williams, 565 So.2d 1387 (Fla. 5th DCA 1990). This effectively means that hearsay from other officers can be repeated by the affiant officer to establish probable cause.
We believe it would be illogical to hold on the one hand that officers may put hearsay in their affidavits, but on the other that they must vouch for the truthfulness of the hearsay on penalty of perjury.[4] As to hearsay, officers obviously are vouching for nothing more than the fact that the hearsay was told them and they have no reason to doubt its truthfulness. It then is within the discretion of the magistrate to determine the weight accorded the hearsay. To this end, the magistrate may question the officer about any matter that might reflect upon the truthfulness or accuracy of the hearsay, but there obviously will be cases in which unverifiable hearsay alone will establish probable cause.
Because this is true, most affidavits will include at least some information that can be characterized as true only "to the best knowledge and belief" of the officer. The fact that the oath below was frank about the matter hardly can be deemed the undoing of the warrant. To say otherwise effectively would *655 force officers either to face perjury charges for any hearsay that proves untruthful or to bring all sources of hearsay information into court to individually swear before the magistrate. The law requires neither of these.
For these reasons, the trial court erred in finding the warrant unlawful for failure to include a proper oath. The oath here was legally sufficient.[5]Accord United States v. Gaertner, 705 F.2d 210 (7th Cir.1983), cert. denied, 464 U.S. 1071, 104 S.Ct. 979, 79 L.Ed.2d 216 (1984) (probable-cause affidavit held valid when sworn "on information and belief" of officer). As the United States Supreme Court itself has noted:
"[W]hen the Fourth Amendment demands a factual showing sufficient to comprise `probable cause,' the obvious assumption is that there will be a truthful showing" (emphasis in original). This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.
Franks, 438 U.S. at 164-65, 98 S.Ct. at 2681 (quoting United States v. Halsey, 257 F. Supp. 1002, 1005 (S.D.N.Y. 1966), aff'd, Docket No. 31369 (2d Cir., June 12, 1967)).
On a related point, Johnson urges us to find the warrant invalid for failure to include alleged material facts. Johnson contends that officers had found his fingerprints at the crime scene but failed to tell the magistrate they were located on the outside window sill. Likewise, officers did not inform the magistrate that the point of entry to the residence could have been the open front door and that fingerprints not belonging to Johnson were found in the house.
Any discussion of omissions in this context must begin with the United States Supreme Court's holding in Franks, which established a limited form of review for misstatements contained in probable cause affidavits. Central to this review is a requirement that the moving party (1) must show the misstatement material to the question of probable cause and (2) must show a requisite level of intent by police to deceive.
Under Franks, the intent prong requires the movant: (1) to point out the specific portion of the affidavit alleged to be defective; and (2) to allege that the defect consisted either of a deliberate falsehood or a statement in reckless disregard of the truth; and (3) to offer proof supporting the allegations in the form of affidavits or other sworn or reliable statements of witnesses, or satisfactorily explain their absence.[6] Allegations of neglect or innocent mistake will not meet this requirement, nor is it sufficient to allege that the police themselves were innocently misled by others. The materiality prong of Franks requires the moving party to establish that the affidavit, with the misstatements deleted, would itself fail to establish probable cause. Only if both prongs of the Franks rule are established will the moving party be granted a full evidentiary hearing on the issue. Franks, 438 U.S. at 171-72, 98 S.Ct. at 2684-85.
Commentators have noted that Franks dealt solely with the problem of misstatements, and that the Franks rule could not logically be applied precisely the same way to factual omissions from the affidavit. We agree. For one thing, the only reasonable standard for judging the effect of the omission would be to determine if probable cause would still exist if the omitted material were included in the affidavit.
*656 For another, misstatements are fundamentally a different problem than omissions. Some omissions may be "intentional" but also reasonable in the sense that they exclude material police in good faith believed to be marginal, extraneous, or cumulative. Such an exclusion is a valid and necessary part of the warrant process. Moreover, some omitted information is simply overlooked in the exigencies of the moment without intent to deceive or recklessness with respect to the truth. The State and the defense reasonably may disagree as to the import and effect of the large amount of information that necessarily will be omitted in the warrant process, since police routinely collect far more information than goes into the affidavit. 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 4.4(b) (2d ed. 1987 & Supp. 1995).
The leading federal case confronting these questions apparently is United States v. Colkley, 899 F.2d 297 (4th Cir.1990). This case cogently noted that challenges to omissions
potentially open[] officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit. The potential for endless rounds of Franks hearings to contest facially sufficient warrants is readily apparent.
Id. at 301. The Colkley court then distilled the central problem Franks addresses: intentional or reckless police conduct that may be said to have resulted in deception. Thus, the omitted material "must be such that its inclusion in the affidavit would defeat probable cause for arrest." Id. LaFave notes in this vein that, as a general rule, materiality of the omitted information to the probable cause hearing does not alone lead to an inference of deception, though there may be some situations where the omission is so striking that the inference is compelling. LaFave, supra, § 4.4(b), at 58 (Supp. 1995).
We agree with this discussion. In harmony with the central thrust of Franks, we hold that the Franks standard applies to alleged omissions from probable cause affidavits except that (1) the reviewing court must determine whether the omitted material, if added to the affidavit, would have defeated probable cause, and (2) the reviewing court must find that the omission resulted from intentional or reckless police conduct that amounts to deception. Absent these factors and the other Franks requirements, the motion for a Franks hearing will be summarily denied. If all requirements are met by movant, then a full evidentiary hearing will be ordered for presentation of evidence and rebuttal by the State.
Turning to the facts at hand, we first note that Johnson's appellate brief only addresses the materiality prong of a Franks inquiry. The other prong is moot in any event, because we agree with the trial court that the "omissions" in question were not material in the sense that they could not possibly have altered the probable cause finding. The fact that Johnson's fingerprints were found at the scene near a window that reasonably appeared to have been forcibly entered is sufficient in and of itself to create probable cause. Nor is it relevant that the fingerprints of another person were found inside the house, since this will be true at almost any crime scene. Finally, it is equally irrelevant that police did not tell the magistrate of the possibility of an alternative point of entry. All of these "omissions" at best were de minimis and in no sense vitiated probable cause, and there certainly is no suggestion of reckless or intentional disregard of the truth.[7]
As to the arrest, Johnson also contends that it was accomplished without probable cause and that, in any event, the arrest occurred before the arresting officer even knew of the warrant's existence. The arrest of Johnson occurred in a somewhat unusual way that apparently surprised even the police department. Around 8 p.m. on the day in *657 question Officer Castro, the arresting officer, engaged in a conversation with a fellow officer, Detective Redden. The latter told Castro that Johnson was suspected of murder, showed Castro a photograph of the suspect, and said that an arrest warrant was being obtained at that time.
There is much dispute over what else was said. Castro said he felt Redden had told him to arrest Johnson if he saw him, while Redden testified she gave no such instruction. Moreover, the only piece of information Castro said he had to connect Johnson to the crime was that Redden said his fingerprints were found at the scene. Redden, meanwhile, was impeached on this point by prior inconsistent statements. However, Redden did testify she believed other officers in the department possessed probable cause to arrest Johnson. In any event, the record is clear that the warrant was signed shortly before 9:30 p.m. and that a radio message about the warrant's existence was made to at least some other officers around this same time.
It appears, however, that Castro had never heard the radio report when he spotted Johnson walking along a street a few minutes later, nor did he have any other knowledge of the warrant's existence. Castro recognized Johnson as the man whose photograph Redden had shown him, and confirmed the identity by asking Johnson his name, which Johnson gave. Castro then arrested Johnson. The time was 9:48 p.m., at least eighteen minutes after the warrant was signed.
The issue here is whether an officer who himself lacks any personal knowledge to establish probable cause, who has not been directed to effect an arrest,[8] and who does not know a valid warrant has been issued nevertheless can lawfully arrest a suspect. In broad terms, the collective knowledge of police investigating a crime is imputed to each member under a rule of law often called the "fellow officer rule" or "collective knowledge doctrine." The exact contours of the rule are not entirely clear. Florida courts have tended to frame this doctrine in very sweeping terms, e.g., Carroll v. State, 497 So.2d 253 (Fla. 3d DCA 1985), review denied, 511 So.2d 297 (Fla. 1987), though we obviously are bound by any contrary federal law in the Fourth Amendment context. Perez.
We recognize that some lower federal courts have limited the doctrine to two fairly narrow circumstances. The first is when an arresting officer with no personal knowledge of any facts establishing probable cause nevertheless is directed to make the arrest by other officers who do have probable cause. The other is when the arresting officer possesses personal knowledge that, standing alone, is insufficient to establish probable cause but when shared with the knowledge of other officers collectively meets the requirement. Charles v. Smith, 894 F.2d 718, 724 (5th Cir.), cert. denied, 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990). The record does not support the conclusion that Castro fell within either of these two instances.
Other courts have elaborated on the question in somewhat different factual contexts, typically requiring a direct communications link between officers who possess probable cause and the arresting officer. This often takes the form of a direct order that the arrest be effected, United States v. Woods, 544 F.2d 242 (6th Cir.1976), cert. denied, 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977), but also can consist of general communications among officers at least one of whom possesses probable cause. United States v. Edwards, 885 F.2d 377 (7th Cir.1989). We recognize that this last category is to some degree inconsistent with the formulation of the Fifth Circuit in Charles.[9] *658 Nevertheless, there is competent substantial evidence that Castro fell within this particular category, since Redden had been in communication with persons who possessed probable cause and later communicated that information to Castro. We thus believe that the arrest, at a minimum, was supported by probable cause under the fellow-officer rule.
Alternatively, we believe the existence of a valid warrant prior to arrest is itself sufficient to justify the arrest under the facts at hand. While we acknowledge the more restrictive holdings of some lower federal appellate courts, e.g., Charles, we are not bound by those cases under the plain language of article I, section 12.[10] On Fourth Amendment issues, we are bound only by factually apposite holdings of the United States Supreme Court, art. I, § 12, Fla. Const., and we therefore must be mindful of the warnings issued by the United States Supreme Court about the purposes of the exclusionary rule. Absent controlling precedent from the United States Supreme Court, policy considerations underlying the Fourth Amendment are an appropriate polestar to guide us in deciding among conflicting views of Fourth Amendment issues.
In Leon, the Court noted that the purpose of the exclusionary rule is to act as a deterrent for violations of the Fourth Amendment, not as a technical device for the benefit of defendants. The Court stated:
Particularly when law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system. Stone v. Powell, [428 U.S. 465, 490, 96 S.Ct. 3037, 3050, 49 L.Ed.2d 1067 (1976)]. Indiscriminate application of the exclusionary rule, therefore, may well "generat[e] disrespect for the law and administration of justice." Id., at 491, 96 S.Ct., at 3051. Accordingly, "[a]s with any remedial device, the application of the rule has been restricted to those areas where its remedial objects are thought most efficaciously served." United States v. Calandra, [414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974)].
468 U.S. at 907-08, 104 S.Ct. at 3412-13. We believe there could be few cases more deserving of an application of this core policy than the present one. Here, the defendant was arrested by an officer who may have "jumped the gun" in terms of technical protocol, but we see little remedial good that would come from applying the exclusionary rule in this context. Police clearly made every effort to comply with the Fourth Amendment, as shown by the valid warrant in their hands. There could be no more substantial showing of good faith than the existence of a valid warrant prior to arrest, even though the arresting officer knew nothing of it. Leon. Accordingly, we hold that knowledge of the existence of a valid warrant is imputed to all officers in departments working on the case from the moment the warrant is signed, without regard to actual knowledge, at least where the arrest is prompted by the crime identified by the warrant or its accompanying papers.[11] A delay in communication should not let a suspect go free when the State already has fully complied with the warrant clause, because there could be no remedial value in such a draconian penalty. U.S. Const. amend. IV.
As his second issue, Johnson argues that his confessions should have been suppressed for a variety of reasons. He states that Officer Castro violated the procedures established under either section 901.16 *659 or section 901.17, Florida Statutes (1987).[12] Arrest statutes such as these are subject to a substantial compliance analysis, Conti v. State, 540 So.2d 934 (Fla. 1st DCA 1989); Flowers v. State, 152 Fla. 649, 12 So.2d 772 (1943), cert. denied, 320 U.S. 767, 64 S.Ct. 49, 88 L.Ed. 458 (1943), because they direct ministerial acts not of a constitutional dimension. Officer Castro testified that he did not know the precise details of the offense resulting in arrest except that it was a homicide and that he did not know the warrant had been signed. For this reason, it clearly was reasonable for him to leave the task of substantial compliance to other officers. Whether or not the arrest in question here is deemed a probable-cause arrest or arrest by warrant, it was lawful.
Johnson next argues that officers violated his rights under section 907.04, Florida Statutes (1987), which states in pertinent part:
If a person who is arrested does not have a right to bail for the offense charged, he shall be delivered immediately into the custody of the sheriff of the county in which the indictment, information, or affidavit is filed.
Johnson argues that he was kept in the custody of city police, leading to his confessions, in violation of the statute. We believe this argument overlooks the intent of section 907.04. The statute originated in 1939, long before the procedural innovations now used by Florida courts. We find that its sole purpose was to direct the disposition of suspects following initial booking procedures, any related questioning, and first appearance. So long as officers substantially comply with the statutory directive, there is no error. None exists here.
Johnson also urges error in the failure to suppress a statement Johnson made to an officer while being escorted to jail. In the statement, Johnson asked if he could get a "shot." The officer testified he asked Johnson what he meant, thinking the suspect might want a "shot" of liquor. Johnson answered that he would rather receive a shot than die in the electric chair. We find that the record clearly supports the conclusion Johnson made this statement voluntarily and spontaneously, and not as part of custodial interrogation. The fact that the officer asked an innocuous question does not in itself constitute interrogation because the question here was not intended to elicit an incriminating response. The fact that Johnson incriminated himself was a complete surprise in light of the obvious ambiguity of his initial unsolicited remark. Accordingly, there was no error in the failure to suppress it and, even if there were, the error clearly would be harmless in light of the other confessions.
Johnson also argues that error occurred because police effectively denied him access to a public defender's representative present at the jail shortly before he gave yet another confession elaborating details of the murder and identifying the location of a murder weapon. He believes this violated Haliburton v. State, 514 So.2d 1088 (Fla. 1987). We disagree. Haliburton stands for the proposition that, once a suspect has retained counsel, police may not refuse to tell the suspect that counsel is present in the jail for consultation. Here, Johnson had no counsel, requested no counsel, and waived his right to counsel. There was no error. For the same reason, there was no violation of Johnson's rights under the Sixth Amendment or under article I, section 16 of the Florida Constitution. Those rights had been fully waived, even assuming arguendo they had attached.
Johnson asserts that this last confession was illegal because it flowed from earlier *660 unlawful confessions and thus was fruit of the poisonous tree. For the reasons expressed above, the earlier interrogations were lawful. There was no error on this point. We likewise are unpersuaded by Johnson's argument that he effectively invoked his right to remain silent by telling police he was tired. While such statements in fact were made, they do not equate to a request to honor the right. Moreover, Johnson himself indicated his desire to continue with the interrogation.
On a related point, Johnson also contends that this last confession was improperly coerced through a deprivation of his right to a first court appearance within twenty-four hours of arrest. See Fla.R.Crim.P. 3.130. We have held that coercion of this type, if properly shown, would be a possible ground for suppression of a confession. Keen v. State, 504 So.2d 396, 399-400 (Fla. 1987). Nevertheless, the confession identified here occurred less than twenty-four hours after arrest, and therefore cannot possibly fall within the Keen rule. Moreover, the record contains competent substantial evidence that Johnson was not coerced in any sense during this particular confession. Because all the confessions were lawful here, we reject Johnson's contention that police discovery of the knife was fruit of the poisonous tree.
As his third issue, Johnson contends that a deputy clerk qualified and swore in jurors, violating the jury-selection process. In actuality, the record reflects that the deputy clerk merely determined whether jurors fell into categories of persons that might be unqualified to serve, which is a permissible task for a deputy clerk. Nothing in State v. Singletary, 549 So.2d 996 (Fla. 1989), is to the contrary. That opinion only addressed the specific qualification process of voir dire  not the general qualification process to determine if jurors actually are eligible to serve.[13] Johnson further argues that section 905.01(2), Florida Statutes (1987), required that only a judge swear jurors. We do not agree with this construction of the statute; and even if we did, that construction would render the statute unconstitutional for infringing upon the rulemaking authority of the courts. See art. V, § 2(a), Fla. Const. We find nothing in our rules or the law prohibiting a trial court from delegating the responsibilities given to the deputy clerk here.
For the same reasons, we reject Johnson's fourth contention that the grand jury that indicted him was improperly qualified and sworn. Likewise, we reject his contention that failure to record grand jury proceedings deprived him of his constitutional rights. There is no such requirement absent a showing of particular need, which Johnson has not made. Thompson v. State, 565 So.2d 1311 (Fla. 1990). We also find that any errors contained in the general qualifying questions posed to jurors were trivial, did not affect the selection process in this case, and thus were harmless beyond a reasonable doubt.
Fifth, Johnson argues that the twenty-four-day period separating the end of voir dire from the commencement of trial violated his rights because of the potential for contaminating the jury with pre-trial publicity. Johnson contends that the trial court took inadequate precautions to guard against contamination when it questioned jurors upon return for trial, contrary to Derrick v. State, 581 So.2d 31 (Fla. 1991). The record reflects the following exchange between judge and jury at this time:
THE COURT: ... .
And so I ask each of you if anyone has in fact read any articles pertaining to this case since we were last here in court, if they would please hold up their hand.
THE JURY: (No affirmative response.)
THE COURT: Okay. So all of you followed those directions and didn't read anything pertaining to this case or have any discussions with anyone about anything pertaining to this case since we've last left; is that correct?

*661 THE JURY: (Affirmative response.)
THE COURT: Have any of you heard anything about Mr. Emanuel Johnson since we've last left this courtroom?
THE JURY: (No affirmative response.)
THE COURT: So would I be correct, then, in stating that any verdict that you would render in this case would be an impartial verdict based solely on the evidence presented at trial?
THE JURY: (Affirmative response.)
THE COURT: Is that correct?
THE JURY: (Affirmative response.)
We find that this fairly detailed exchange amply complied with Derrick. As Derrick noted, "[i]f none of the jurors read the material, then its publication could not have prejudiced the defendant and the trial may proceed."[14]Id. at 35 (citations omitted). The judge below fully complied with this rule.
Because there has been no showing that any jurors were subjected to pretrial publicity after voir dire, we likewise disagree with Johnson's argument that additional voir dire or selection of a new jury was necessary once trial commenced several weeks later. We further find that the delay between voir dire and trial was entirely justified because there was a genuine problem in trial scheduling due to the variety of charges pending against Johnson. Moreover, we distinguish the present case from McDermott v. State, 383 So.2d 712 (Fla. 3d DCA 1980), upon which Johnson principally relies. The problem addressed in McDermott and similar cases was lengthy delays after the final jury panel is sworn. The record here clearly reflects that the jury was not sworn until the day trial commenced, which is a reasonable procedure when a trial court faces scheduling problems such as occurred here. The swearing in of jurors marks the point at which jeopardy attaches, which raises distinctly different problems than would exist beforehand. Thus, we see nothing unlawful in the procedure used here, particularly in light of today's docketing problems and speedy-trial requirements.
Sixth, Johnson contends that two jurors should have been dismissed for cause because they expressed favor toward the death penalty. While this is true, it does not alone dispose of the issue. Jurors who have expressed strong feelings about the death penalty still may serve if they indicate an ability to abide by the trial court's instructions and the law. Penn v. State, 574 So.2d 1079 (Fla. 1991). On this point, the trial court is in the best position to gauge the issue, and that determination will not be reversed on appeal if there is competent record support for the judge's conclusions. Here, both jurors clearly stated they could abide by the trial court's instructions and the law, and we therefore may not reverse on this point.
As his seventh point, Johnson argues that he was deprived of a representative jury because, in the four separate cases against him, only two out of one hundred and sixty venire members were black.[15] To the extent Johnson is arguing error in the other three cases, we may not now address those issues because they are not properly before us. As to this case, the record clearly establishes that the venire was randomly generated by computer, a conclusion Johnson has not rebutted. Because the record competently supports the trial court's finding of no discrimination, we find no error.
Eighth, Johnson urges error in an alleged "manipulation" of trial dates by the judge below to obtain convictions that then could be used as aggravating factors. Combined with alleged discovery violations, these errors seriously undermined Johnson's rights, he argues. The record reflects that the trial dates were set in chronological order according to the date of the offense, with modifications made to accommodate the parties as needed. Moreover, nothing in the Constitution forbids trial scheduling that may coincidentally advantage the State's case for aggravation in the penalty phase, so long as the scheduling decision is otherwise reasonable. We likewise find no merit to Johnson's related claim of discovery errors. The *662 record reflects the materials in question generally were cumulative, and any resulting error clearly would be harmless beyond a reasonable doubt.
Ninth, Johnson contends that this Court's page limits on appellate briefs deprived counsel of the ability to address all issues in this case. This issue is moot in light of the fact that we later ordered counsel to file supplemental briefing as to penalty phase issues, which we will now address.
As his tenth issue, Johnson argues that the trial court committed various errors in rulings affecting the presentation of mitigating factors. The first two of these are relevant only to Johnson's separate death appeal for the murder of Iris White and may not be raised in this proceeding.[16]
The third claim deserves some comment here. The trial court permitted both the State and the defense to adopt arguments in the separate record of Johnson's other capital case regarding his possible suicide attempts. The following colloquy sets forth the entire exchange:
MR. TEBRUGGE: I would like to proffer Defense Exhibits LL and NN. These are medical records revolving around two apparent suicide attempts by the defendant.
The Court may recall case 88-3199 I proffered the same materials and the Court sustained objections to the materials, and at this time I am reproffering those two documents.
THE COURT: That's the one from Mississippi and from the jail here?
MR. TEBRUGGE: Yes, Your Honor.
THE COURT: Okay.
MR. DENNEY: Judge, we would have the same argument and we would ask that the Court adopt the same argument that was in the last trial.
I think, if I'm correct, our argument was twofold, that they're only parts of records, and also there was not anybody from the jail that could testify that these were, I guess, accurate and as to the circumstances surrounding the documents. I don't really recall the entire objection we had, but I would ask the Court to adopt whatever the argument was at the last trial.
THE COURT: Okay. I would enter the same ruling and both the Defense and the State may adopt their prior arguments for the admission and the nonadmission of those hospital records.
MR. TEBRUGGE: Could I just state for the record, Judge, I will be attempting to move those through witness Charlene Johnson who will be one of the next witnesses scheduled.
THE COURT: All right, sir.
Except for the failure of defense counsel to object, we would hold that the State never can claim a sudden loss of memory and then try to incorporate "whatever the argument was" in a separate record. This is a clear violation of the single-record requirement of both Wuornos and Jackson. Moreover, we note that there may be cases where a trial court itself errs in cross-referencing rulings made in separate records, because such a procedure risks obscuring the issue actually being addressed.[17] Since no objection was raised here, however, any such issue is procedurally barred.
For the reasons noted above and subject to the reservations expressed herein, we take notice of the record in Johnson v. State, 660 So.2d 637 (1995), to elucidate the entry quoted above and other matters in this case. To that end, we quote our holding in the latter case, which also disposes of the issues here:
Johnson further contends that the trial court improperly refused to admit medical records about various psychological problems he had over many years, including suicide attempts and treatment by medication. *663 The record, however, indicates that Johnson's counsel attempted to introduce these records without authenticating them, which is required under the evidence code. § 90.901-902, Fla. Stat. (1987). The rules of evidence may be relaxed during the penalty phase of a capital trial, but they emphatically are not to be completely ignored. Moreover, the trial court found that the records were not complete in themselves and required interpretation to be understood by the jury. The judge even offered to admit them if defense counsel laid the proper predicate, which counsel did not do. Accordingly, there was no error in declining the request in light of counsel's actions.
Id., 660 So.2d at 645-646 (Fla. 1995). Johnson also urges error in the trial court's refusal to let defense counsel argue that the death penalty is not effective as a deterrent and that it costs the state more to execute an inmate than to incarcerate for life. These arguments are political questions and are not relevant concerns during trial in a court of law. See Johnson, 660 So.2d at 645-646 (1995).
Eleventh, Johnson argues that the trial court applied the wrong standard in gauging mitigating evidence of emotional disturbance. Because the precise issue also was raised in Johnson's other appeal, which we have judicially noticed, we reiterate our holding in that case:
We acknowledge that the record establishes a history of emotional problems, but the central issue here is not that such evidence exists but the weight to be accorded it. On the question of weight, the trial court's ruling will be affirmed if supported by competent substantial evidence.
The record reflects that the evidence of Johnson's disturbance in the penalty phase came largely from anecdotal lay testimony poorly correlated to the actual offense at issue. Psychological experts had testified extensively as to Johnson's mental state in the earlier suppression hearing, though counsel chose not to bring these same experts before the jury in the penalty phase. Even then, Johnson's case for mental disturbance in the suppression hearing was partially controverted and is itself consistent with the trial court's conclusion that Johnson's psychological troubles did not rise to the level of a statutory mitigator. We therefore cannot fault the trial court's determination as to mental mitigation.
Johnson argues that Walls v. State, 641 So.2d 381 (Fla. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 943, 130 L.Ed.2d 887 (1995), required the trial court to find the statutory mitigator of extreme mental disturbance, but we are unpersuaded. The trial court found and weighed nonstatutory mental mitigation and expressly concluded that the evidence actually presented did not rise to the level of statutory mental mitigation. The record as it was developed below contains competent substantial evidence supporting this determination.
Johnson also appears to suggest that, had he introduced expert testimony about his mental state in the penalty phase, the trial court could simply have rejected the testimony wholesale under Walls. Actually, Walls stands for the proposition that opinion testimony unsupported by factual evidence can be rejected, but that uncontroverted and believable factual evidence supported by opinion testimony cannot be ignored. Walls, 641 So.2d at 390-91. Johnson did in fact introduce uncontroverted facts supporting a case for mental mitigation, but the record competently and substantially supports the trial court's determination of weight.
Id., Op. at 17-19, 660 So.2d at 646-647. Johnson next contends that the trial court erred in refusing to modify the standard instructions dealing with the mental mitigators. He suggests that cases such as Cheshire v. State, 568 So.2d 908 (Fla. 1990), effectively have eliminated the requirement that statutory mental mitigators be "extreme." As noted in Johnson, No. 78,336:
This argument rests on a fundamental misconception of Florida law. Statutory mental mitigators are distinct from those of a nonstatutory nature, and it is the latter category that Johnson's revised jury instruction attempted to recast in "statutory" terms. This in effect asked the trial *664 court to rewrite the statutory description of mental mitigators, which is a violation of the separation of powers doctrine. Art. II, § 3, Fla. Const. Nonstatutory mental mitigators are addressed under the "catch-all" instruction, as happened here. Walls, 641 So.2d at 389. Accordingly, there was no error.
Op. at 19, 660 So.2d at 647. Likewise, Johnson argues that the trial court erred in not instructing the jury on the burdens of proof that attach to aggravating and mitigating factors in the penalty phase. We rejected this same argument in Johnson, No. 78,336, in the following terms:
As noted by the Eleventh Circuit Court of Appeals, any argument of this type evinces a misunderstanding of the law of proof. While it is true that specific burdens of proof are necessary to establish the factors, their relative weight is not itself judged by any similar standard. Once the factors are established, assigning their weight relative to one another is a question entirely within the discretion of the finder of fact, Ford v. Strickland, 696 F.2d 804 (11th Cir.), cert. denied, 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983), subject to this Court's constitutionally required proportionality review.
Op. at 20, 660 So.2d at 647. There was no error in the jury instructions.[18]
As his twelfth issue, Johnson argues that the felony murder aggravator is unconstitutional because it creates an "automatic" aggravator and because it can lead to a death penalty in a case in which premeditation was lacking. This argument is without merit. Johnson, No. 78,336, Op. at 647-648.
Thirteenth, Johnson contends that the aggravating factor of "heinous, atrocious, or cruel" is unconstitutional and, in any event, was submitted to the jury on an unlawful instruction. We rejected this same argument in Johnson, id., in the following terms:
We find no error, Fennie v. State, 648 So.2d 95 (Fla. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1120, 130 L.Ed.2d 1083 (1995), and we note in any event that the substitute instruction actually urged by Johnson at trial was not significantly different from the standard instruction. Accordingly, the issue is procedurally barred for failure to present a true alternative. Castro v. State, 644 So.2d 987, 991 n. 3 (Fla. 1994). Moreover, the stabbing-strangulation murder here qualified as heinous, atrocious, or cruel under any definition, and any conceivable error thus would be harmless.
Op. at 21, 660 So.2d 647-648. Because the facts surrounding the murder here are materially the same, we reach the same holding in the instant case.
Having reviewed the entire record in the two cases and finding no further error, we also find that the death penalty is proportionately warranted in this case. As the trial court noted, the case for mitigation is relatively weak here and the case for aggravation quite strong. For that reason, the convictions and sentences imposed upon Johnson are hereby affirmed.
It is so ordered.
GRIMES, C.J., OVERTON, SHAW and HARDING, JJ., and McDONALD, Senior Justice, concur.
NOTES
[1] The motion obviously must be accompanied by verified and complete copies of the material urged as a supplement.
[2] Rule 9.200(f) states in pertinent part:

If the court finds the record incomplete, it shall direct a party to supply the omitted parts of the record. No proceeding shall be determined, because of an incomplete record, until an opportunity to supplement the record has been given.
[3] Of course, whether or not an informant may be deemed reliable is governed by the test announced in the cases Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and their progeny.
[4] We are not asked to decide, and we make no holding on, the question of when perjury charges can be brought against officers for alleged falsehoods in probable-cause affidavits. Our statements today are limited solely to the issue at hand.
[5] The present case is obviously distinguishable from Collins v. State, 465 So.2d 1266, 1268 (Fla. 2d DCA 1985), where the issue was the failure to place the officer under oath at the time the affidavit was signed. We express no opinion about the relevant holding of Collins at the present time.
[6] One commentator has noted that the absence of affidavits might be "explainable" in those situations in which probable cause stands or falls on alleged statements of anonymous confidential informants whose identities are not disclosable. Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 4.4(b), at 62 (2d ed. Supp. 1995).
[7] We question whether a Franks hearing was even necessary in this case, given the insubstantial nature of the claim. Nevertheless, the record reflects that Johnson properly pled a Franks error, and we cannot fault the trial court for exercising an abundance of caution in reaching the question.
[8] We assume solely for present purposes that Castro in fact had received no such direction, since the record is conflicting on this point.
[9] The United States Supreme Court has addressed the question in a context also different from the facts at hand  to require suppression where an arrest was based on an actual representation to police that a valid warrant has been issued, which later proves to be untrue. Whiteley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). Because Whiteley is factually distinguishable, we are not bound by its precedent in the present case. Art. I, § 12, Fla. Const. Indeed, our research has disclosed no case precisely like the one today, and the parties have pointed to none.
[10] In pertinent part, article I, section 12, Florida Constitution, states:

[The right against unreasonable searches and seizures] shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court.
(Emphasis added.)
[11] We do not reach the question of whether an arrest for some other unrelated offense can be justified based on an outstanding warrant, where the arresting officer does not know of the warrant's existence. Some other states have held this improper. E.g., State v. Martin, 232 Neb. 385, 440 N.W.2d 676 (1989). We do note that there is no requirement in Florida that the arresting officer must have the warrant in hand at the time of the arrest, but must only show the warrant upon request as soon as is practicable. § 901.16, Fla. Stat. (1987).
[12] Section 901.16, Florida Statutes (1987), states in pertinent part:

A peace officer making an arrest by a warrant shall inform the person to be arrested of the cause of arrest and that a warrant has been issued, except when the person flees or forcibly resists before the officer has an opportunity to inform him, or when giving the information will imperil the arrest.
Section 901.17, Florida Statutes (1987), states:
A peace officer making an arrest without a warrant shall inform the person to be arrested of his authority and the cause of arrest except when the person flees or forcibly resists before the officer has an opportunity to inform him or when giving the information will imperil the arrest.
[13] Likewise, Remeta v. State, 522 So.2d 825 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 182, 102 L.Ed.2d 151 (1988), permits but does not require a judge to preside over the initial general qualification process. Id. at 828 (general qualification is often conducted by one judge). Nothing in the language used in Remeta prohibits a delegation to a clerk or deputy clerk.
[14] The same would be true of broadcasts or other forms of communication that might transmit trial-related information to jurors.
[15] Johnson also is black.
[16] These issues were (1) whether the trial court erred in refusing to let defense counsel argue the lengthy prison terms Johnson was likely to receive in the four separate cases against him, and (2) whether the trial court erred in refusing to let counsel introduce a photograph of Johnson's miscarried daughter, which allegedly had affected him emotionally.
[17] We do note, however, that the issue being addressed is clear in the present case.
[18] We also reject as meritless Johnson's arguments (1) that the standard jury instructions impermissibly place the burden on the defendant to establish a case for mitigation once aggravators have been proven by the State, and (2) that the standard jury instructions impermissibly denigrate the role of the jury in the penalty phase. See Johnson, No. 78,336.