PER CURIAM.
Emanuel Johnson appeals the ruling of the Twelfth Judicial Circuit Court denying his motion to vacate his sentence of death, filed under Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the circuit court’s order.
I. BACKGROUND
Between April and June 1991, Johnson was tried, convicted, and sentenced for several crimes committed between January and October 1988 against four separate victims. Two of the victims — Iris White and Jackie McCahon — were murdered, while two — Kate Cornell and Lawanda Giddens — were not. Johnson’s convictions in the noncapital cases were used as aggravators in both capital cases, and each capital conviction was used as an aggravator in the other capital case. This appeal stems from Johnson’s first-degree murder conviction and accompanying death sentence for the killing of Jackie McCahon. In addition to the murder conviction, Johnson was convicted of armed burglary of McCahon’s home.
Reviewing Johnson’s convictions and sentences on direct appeal, this Court set forth the following facts:
On September 22, 1988, Sarasota police found Jackie MeCahon’s body on a sidewalk in front of her residence. She had been stabbed nineteen times, and twelve of the wounds were fatal. A broken-off piece of a knife blade was found in her body. Blood spatter evidence suggested that McCahon had been attacked as she opened the door, or while inside a bathroom. Police at first suspected several men, but later turned their attention to a tenant of McCahon’s named Emanuel Johnson. When first questioned, Johnson said he had heard police cars arrive and had gone out to see what was happening, but that he did not know McCahon was the victim until someone told him so the next day.
After a lengthy police interrogation, however, Johnson confessed. He said he had gone to McCahon’s residence to say he needed to use her phone because his wife was about to give birth. McCahon knew that Johnson’s wife was pregnant. When McCahon let Johnson in the door, he grabbed her and choked her to semi-consciousness. Then he found a knife, stabbed her several times, cut the phone cord, then took twenty dollars he found. Later, Johnson stated that he then went across the street to his apartment, but saw McCahon stagger out of her residence on to the sidewalk. At this point Johnson said he took a knife from his apartment, went out, and stabbed McCa-hon repeatedly. Police later found a broken knife handle where Johnson said he had thrown the second knife. It matched the broken blade found in the body.
Johnson v. State, 660 So.2d 648, 652 (Fla.1995). For McCahon’s murder, the jury recommended the death sentence by a vote of ten to two. In sentencing Johnson to death, the trial court found three aggravating factors — Johnson had been convicted of a prior violent felony, the murder was committed for pecuniary gain, and the *1034 murder was heinous, atrocious, or cruel (HAC) — and fifteen mitigating factors, including that Johnson suffered mental pressure not reaching the level of statutory mitigation. Johnson, 660 So.2d at 652.
Johnson raised thirteen claims on direct appeal: (1) Johnson’s arrest warrant was defective on several grounds; (2) Johnson’s confessions should have been suppressed; (3) the jury that convicted Johnson was improperly qualified and sworn; (4) the grand jury that indicted Johnson was improperly qualified and sworn; (5) the extended period of time (twenty-four days) between voir dire and trial violated Johnson’s rights; (6) the trial court erred in denying a voir dire challenge for cause; (7) Johnson was deprived of a representative jury because — in the four cases against him — only two out of one hundred venire members were black; (8) the trial court manipulated the dates of Johnson’s four trials in order to use convictions in some cases as aggravators in others; (9) this Court’s page limits on appellate briefs deprived Johnson’s counsel of the ability to address all issues in Johnson’s case; (10) the trial court committed various errors in rulings affecting the presentation of mitigating factors; (11) the trial court applied the wrong standard in evaluating mitigating evidence of emotional disturbance; (12) the felony-murder aggravator is an unconstitutional “automatic” aggravator; and (13) the HAC aggravating factor is unconstitutional and was submitted to the jury on improper instruction. Id. at 653-64. This Court denied each of Johnson’s claims, determined that the death penalty was proportional to Johnson’s crime, and affirmed Johnson’s convictions and sentences. Id. at 664.
II. MOTION FOR POSTCONVICTION RELIEF
A. Procedural Background
In March 1997, Johnson filed a shell motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850.[1] After multiple amended postcon-viction motions, as well as several rulings from both this Court and the court below tolling the time for Johnson to file an amended postconviction motion,[2] Johnson’s postconviction claims proceeded on an amended motion filed in September 2003 and an addendum filed in December 2003.
Johnson raised the following postconviction claims challenging his capital conviction and accompanying death sentence for McCahon’s murder: (1) defense counsel provided ineffective assistance by mishandling mental health experts; (2) the State committed prosecutorial misconduct by manipulating the trial schedule of Johnson’s four trials and failing to make timely *1035 disclosure of exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), rendering defense counsel ineffective in conducting Johnson’s defense; (3) the State engaged in prosecutorial misconduct by offering evidence of sperm after a Federal Bureau of Investigation (FBI) report stated that none had been found, and defense counsel was ineffective in failing to object to the State’s misconduct; (4) defense counsel was ineffective in failing to call a competent mental health expert at Johnson’s penalty phase trial; (5) the prior violent felony aggravator was based on invalid convictions; (6) Rule Regulating the Florida Bar 4 — 3.5(d)(4) unconstitutionally prevented Johnson, through his counsel, from interviewing jurors, thereby rendering counsel ineffective; (7) as applied, the Florida death sentencing statute is unconstitutional; (8) the trial court denied Johnson due process of law by preventing him from informing the jury about his ineligibility for parole and the possible sentences he would likely receive in other pending criminal eases; (9) Johnson’s death sentence is unconstitutional because the penalty phase jury instructions improperly shifted the burden of proof to Johnson, and defense counsel was ineffective in failing to object to the improper jury instructions; (10) Florida’s method of execution by lethal injection constitutes cruel and unusual punishment; (11) Johnson’s convictions are materially unreliable based on the cumulative effect of the errors during his guilt and penalty phase trials; (12) Johnson’s death sentence constitutes cruel and unusual punishment because Johnson may be incompetent at the time of execution; (13) the State engaged in prosecutorial misconduct by presenting false evidence at the suppression hearing, and defense counsel was ineffective in failing to challenge the State’s misconduct; (14) the State violated due process by destroying potentially useful evidence in bad faith; (15) Johnson’s arrest, search, and seizure were all based on a defective affidavit that contained false statements, and defense counsel was ineffective for failing to present these facts at the suppression hearing; and (16) the search warrants were not issued by a neutral magistrate, and defense counsel was ineffective in failing to discover and present this claim.
Each of Johnson’s postconviction claims correlated with a substantially similar claim raised in his postconviction motion challenging his convictions and sentences for the White murder. See Johnson v. State, 104 So.3d 1010, 1015-17 (Fla.2012) (noting the same postconviction claims listed above were raised by Johnson in his postconviction motion regarding the White murder, in addition to four claims raised exclusively in that case). Because of the significant interrelation between Johnson’s postconviction motion in this case and the postconviction motion in the case regarding the White murder, the postconviction court held a consolidated hearing on the motions pursuant to Huff v. State, 495 So.2d 145 (Fla.1986), on September 21, 2005. Following the Huff hearing, the postconviction court entered a single order granting an evidentiary hearing on the first four of Johnson’s postconviction claims in this case — which were substantially indistinguishable from Johnson’s first four postconviction claims in the postcon-viction motion regarding the White murder — and summarily denying the remainder of Johnson’s postconvietion claims. State v. Johnson, Nos. CF 88-3198, et al. (Fla. 12th Cir. Ct. order filed Mar. 1, 2007).
Before the evidentiary hearing was held, Johnson filed several pro se pleadings in both this case and the case relating to White’s murder, seeking to discharge collateral counsel and raising additional *1036 claims that he believed were not adequately addressed by collateral counsel. Ultimately, Johnson withdrew his attempts to discharge counsel, and collateral counsel adopted six of Johnson’s pro se claims. The additional claims alleged that the search warrant in the White murder case, the affidavit in support of the warrant, and the inventory list of items obtained pursuant to the warrant were false in that each document was backdated and signed after the search of his premises had been completed. Although the warrant was issued based on Johnson’s suspected involvement in White’s murder, law enforcement officials recovered items from Johnson’s residence that linked him to the unsolved murder of McCahon. Accordingly, Johnson challenged the allegedly “false” documents in postconviction proceedings related to the White and McCahon murders. Specifically, Johnson argued: (17) the State had the duty to disclose the false documents because they constituted impeachment evidence; (18) the State had a duty to disclose that the false documents had been filed; (19) the State committed a fundamentally unfair act by fabricating, filing, and relying on the false documents; (20) the judge who backdated and signed the false documents was not neutral and detached; (21) the State committed per se reversible error by using and failing to advise the defense about the false documents; and (22) Johnson’s claims regarding the false documents are not procedurally barred because he was deprived of substantive due process. The postconviction court issued a single order summarily denying each of the additional claims as they related to both postconviction cases. The court held that the conclusory allegations contained in the claims were insufficient to require an evidentiary hearing, that the claims should have been raised on direct appeal, and that Johnson had previously argued the issues during the Huff hearing. State v. Johnson, Nos. 88 CF 3198, et al. (Fla. 12th Cir. Ct. order filed Apr. 28, 2009).
B. Evidentiary Hearing Testimony
On August 3 and 4, 2009, the postconviction court held a consolidated evidentiary hearing on the four remaining postconviction claims in this case and in the case related to the White murder. We summarized the testimony presented at the evi-dentiary hearing in our decision affirming the denial of Johnson’s postconviction motion arising from his conviction and sentence for the White murder.
[T]he the postconviction court heard testimony from Johnson’s three trial attorneys — Adam Tebrugge, Tobey Hockett, and Eliot Metcalfe — regarding the defense’s pretrial management of four experts — Dr. Walter Afield, Dr. Michael Maher, Dr. Richard Ofshe, and Dr. John Brigham. Attorney Tebrugge, who was Johnson’s primary attorney for the penalty phase of the trials regarding both the White and McCahon murders, testified regarding Dr. Afield, who was appointed by the trial court pursuant to Florida Rule of Criminal Procedure 3.216 in order to determine whether Johnson was competent to stand trial and whether Johnson may have been insane at the time he committed the murders. Tebrugge testified that throughout the preparation for Johnson’s trials, he had developed concerns with Dr. Afield’s potential testimony and ultimately was convinced that Dr. Afield would not be a helpful witness to the defense. Tebrugge further testified that the decision not to use Dr. Afield as a witness during either Johnson’s guilt or penalty phase trials was based on the defense’s feeling that Dr. Afield would not be a helpful witness. Tebrugge testified that the decision was not based on any threat by the State to present con- *1037 tradieting expert testimony if the defense called Dr. Afield as a witness.
Attorney Metcalfe, who at the time of Johnson’s trials was the Public Defender for the Twelfth Judicial Circuit, testified to similar effect. Metcalfe testified that the defense could not get a straight answer from Dr. Afield regarding whether a valid basis existed on which to rest an insanity defense and that, as a result, he believed that Dr. Afield’s testimony would undermine any attempted insanity defense. Metcalfe testified that for this reason, he was nervous about calling Dr. Afield as a witness and that he ultimately became uncomfortable with using Dr. Afield for any purpose whatsoever. Metcalfe testified that Johnson’s trial team had conducted strategy sessions regarding whether to use Dr. Afield as a witness and that the attorneys had ultimately decided against using Dr. Afield at trial.
Regarding the decision to make Dr. Afield available for a deposition, Attorney Hoekett, who worked primarily on the pretrial aspects of Johnson’s trials, testified that the defense had originally listed Dr. Afield as a potential witness, which allowed the State to depose him. Hoekett testified that when, during the deposition, the State asked Dr. Afield to disclose confidential information regarding his conversations with Johnson, Hoekett objected to the State’s question but did not feel that he could do anything else to prevent Dr. Afield from answering the question.
Dr. Afield also testified at the eviden-tiary hearing. Dr. Afield testified that he had evaluated Johnson on October 27, 1988, while Johnson was incarcerated. Dr. Afield recalled his impression that Johnson was chronically retarded and schizophrenic and that Johnson had been attempting to control his psychosis with prescription medication and cocaine, both of which made the psychosis worse. Dr. Afield testified that he had discussed the possibility of an insanity defense with Johnson’s trial counsel and had informed them that such a defense might be possible but that he would need more information to be certain. However, Dr. Afield testified that after he was deposed in September 1990, he did not hear from counsel again regarding the possibility of pursuing an insanity defense. Thus, in April 1991, he submitted a report advising trial counsel that he did not believe there was a basis for an insanity defense. On cross-examination, Dr. Afield testified that he did not believe that Johnson could have been faking insanity by pretending to be delusional. In Dr. Afield’s opinion, Johnson was too mentally retarded to pretend to be insane. On redirect, Dr. Afield admitted that Johnson’s IQ was roughly 100, which is normal, although Dr. Afield stated that other tests were indicative of brain dysfunction. Dr. Afield also recalled that, during his evaluation, Johnson made admissions regarding the crimes with which he was charged.
Regarding Dr. Maher, attorney Te-brugge testified that based on his dissatisfaction with Dr. Afield, he decided to employ Dr. Maher, a psychiatrist who specialized in the areas of substance abuse and cocaine psychosis. Tebrugge testified that after the defense listed Dr. Maher as a potential witness, Dr. Maher was deposed by the State, during which he made several statements regarding admissions made by Johnson. Te-brugge testified that based on Dr. Maher’s deposition, he decided not to call Dr. Maher as a witness after discussing the issue with Johnson. Tebrugge also testified that the State had threatened to call Dr. Maher as a State’s witness *1038 based on the information he revealed during his deposition. Tebrugge objected to the State’s threat on the grounds that any admissions made by Johnson to Dr. Maher were privileged and could not be introduced at trial. Tebrugge testified that it was his belief that although listing Dr. Maher as a potential witness allowed the State to depose him and waived any attorney-client privilege attached to Dr. Maher, such waiver could be revoked by removing Dr. Maher as a potential witness.
Regarding Dr. Ofshe, an expert in coerced confessions, attorney Hockett testified that the defense saw Dr. Ofshe as its best chance to suppress Johnson’s confession because Dr. Ofshe believed that the confession had been coerced and because Dr. Ofshe had intentionally avoided asking Johnson any questions that could lead to admissions regarding the crimes. Hockett testified that the defense had presented Dr. Ofshe’s testimony at the motion to suppress hearing but that, after the court denied the defense’s motion, the defense never considered using Dr. Ofshe as a guilt phase witness. Hockett testified that the defense decided it would not be helpful to present Dr. Ofshe as a witness at trial because it had already preserved the issue at the suppression hearing and because repeating a week’s worth of testimony would not have aided the defense.
Regarding Johnson’s claim that the State’s manipulation of Johnson’s four trial dates had rendered Johnson’s counsel ineffective, attorney Hockett recalled that the defense had worked on securing Dr. Brigham, an expert in eyewitness identification, as an expert in the case regarding victim Cornell. Hockett testified that the defense had made multiple attempts to continue Johnson’s trial schedule in order that Dr. Brigham could have time to adequately prepare for the trial regarding victim Cornell but that the trial court had denied the defense’s motions for continuance. Attorney Metcalfe similarly testified that the defense had discussed using Dr. Brigham as an expert in eyewitness identification in the trial regarding victim Cornell and possibly also the trial regarding victim Giddens.
Dr. Brigham also testified at the evi-dentiary hearing. Dr. Brigham testified that he had been contacted in the late spring of 1991 by attorney Hockett about the possibility of testifying as an expert witness in the trial regarding victim Cornell. After reviewing some materials from the case, Dr. Brigham replied that he would not have the chance to fully review the necessary materials before trial but that, if the trial were to be postponed, he would be interested in participating. Dr. Brigham acknowledged that he had sent Hockett a letter on April 18, 1991, stating that his testimony would be most useful regarding the effect that exposure to several prior photo lineups would have had on a witness’s ability to correctly identify a perpetrator from a subsequent lineup. Dr. Brigham claimed that — had he been able to testify at trial — he would have assisted Johnson’s trial attorneys in cross-examining any eyewitness. On cross-examination, Dr. Brigham admitted that he would have testified at trial only regarding general principles of eyewitness identification. Dr. Brigham also admitted that he had not performed an actual study on Cornell’s identification. On redirect, Dr. Brigham clarified that had he been employed as an expert by the defense, he would have conducted a thorough study of all relevant records and reached an expert opinion regarding *1039 Cornell’s eyewitness identification of Johnson.
The postconviction court also heard the testimony of Marjorie Hammock, a professor of social work who was tendered by collateral counsel as a mitigation specialist based on her expertise in biopsychosocial assessments — a tool for explaining how individuals came to be in a particular situation in their lives. Ms. Hammock performed a biopsychosocial assessment of Johnson, reviewed the Department of Corrections’ records for Johnson, examined his health, mental health, and school records (grades one through six), and read interviews with several of Johnson’s family members and other individuals involved in the case. Ms. Hammock also personally interviewed several of Johnson’s family members and interviewed Johnson himself three times. Based on these sources, Ms. Hammock testified that poverty and abandonment were key patterns in Johnson’s life. Ms. Hammock also testified that Johnson felt oppressed by the white community and that Johnson had been ridiculed by the teachers and children at his school. Ms. Hammock stated that Johnson had attempted to commit suicide twice — once as a young teenager by taking his mother’s antidepressant pills and later by attempting to slit his wrists while incarcerated — and that Johnson used crack cocaine extensively by the time of the murders. Ms. Hammock then testified regarding the miscarriage of Johnson’s first child and the effect it had on him, including that he carried a picture of the dead child with him and showed it to everyone. Ms. Hammock concluded that Johnson had been in psychological distress for most of his life and that he was unable to deal with the issues that confronted him.
On cross-examination, Ms. Hammock testified regarding Beverly Ackerman, an investigator employed by Johnson’s trial counsel for the purpose of gathering mitigation evidence. Ms. Hammock agreed that she and Ms. Ackerman had interviewed many of the same people and read many of the same records. Ms. Hammock admitted that Ms. Acker-man had interviewed some people and reviewed some records that Ms. Hammock had not. Ms. Hammock claimed, however, that although much of her investigation overlapped with Ms. Acker-man’s investigation, the information that she gathered from the records and interviews was not necessarily the same as that gathered by Ms. Ackerman. Attorney Metcalfe also testified regarding Ms. Ackerman, recalling that his strategy was to gather as much information about Johnson as possible. To this effect, Metcalfe had sent Ms. Ackerman to Johnson’s hometown in Mississippi because he felt that as a black female, Ms. Ackerman would have the best chance of connecting with and getting information from Johnson’s family and community.
Johnson, 104 So.3d at 1017-20.
C. Postconviction Court’s Ruling
After the evidentiary hearing, the post-conviction court denied the remainder of Johnson’s claims in the case for the McCa-hon murder. Because these claims were identical to those raised in the case related to the White murder, the postconviction court denied the claims in both cases in the same order. We summarized the postcon-viction court’s ruling in our opinion affirming the denial of Johnson’s postconviction motion in the case for the murder of White.
Regarding Johnson’s first claim that his trial counsel rendered ineffective assistance by mishandling the defense’s mental health expert witnesses, the *1040 postconviction court held that counsel was not ineffective in failing to call Dr. Afield as a witness because (1) it was clear that the decision was a tactical one based on the fact that Dr. Afield’s testimony would have been more harmful than helpful to the defense; and (2) Johnson had not established prejudice in light- of this Court’s ruling on direct appeal that the evidence of Johnson’s mental disturbance — as presented in full at the suppression hearing at which Dr. Afield testified — did not rise to the level of a statutory mitigator. Johnson, 660 So.2d at 646-47. Similarly, regarding counsel’s decision not to call either Dr. Maher or Dr. Ofshe at trial, the post-conviction court concluded that counsel’s performance was not deficient, but was strategic based on the content of both doctors’ potential testimony and that Johnson was not prejudiced by the lack of testimony. Furthermore, the court ruled that Johnson was not prejudiced by his counsel’s decision to allow each of the doctors to be deposed because none of counsel’s decisions regarding the doctors were influenced by the State’s threat to call Dr. Maher at trial.
The postconviction court also denied the portion of Johnson’s second claim alleging that defense counsel mishandled Dr. Brigham during the trial relating to victim Cornell and that Johnson was prejudiced by counsel’s deficiency because his conviction in that case was used as an aggravator in the capital cases, The court found that counsel was not deficient because the requests for continuance in order to accommodate Dr. Brigham’s schedule were denied and that Johnson had suffered no prejudice because Dr. Brigham’s testimony was by no means certain to be admitted at trial. The court also found that even in Dr. Brigham’s absence, Johnson’s trial counsel intensely challenged Ms. Cornell’s identification of Johnson.
Finally, the postconviction court denied Johnson’s claim that his counsel was ineffective in failing to hire a mitigation expert to investigate and testify at Johnson’s penalty phase trial. The court determined that counsel was not deficient because mitigation had been a central focus of the defense, as evidenced by Ms. Ackerman’s investigation. The court found that Ms. Hammock would have performed substantially the same in investigating and reporting mitigating evidence as did Ms. Ackerman. The court concluded that Johnson’s argument that an expert such as Ms. Hammock would have presented the evidence more articulately or credibly was nothing more than second-guessing his trial counsel’s strategic decisions. The court further concluded that Johnson had failed to establish prejudice because much of the information testified to by Ms. Hammock was expressed clearly, articulately, and credibly by Johnson’s family members during his penalty phase trial.
The postconviction court made no ruling regarding Johnson’s allegations in his second claim that the State had failed to timely disclose exculpatory evidence. The postconviction court also failed to address Johnson’s third claim alleging prosecutorial misconduct relating to evidence of sperm found at the crime scene. However, shortly after its order following the evidentiary hearing, the postconviction court sua sponte issued another order clarifying that it also denied the remainder of Johnson’s second claim as well as Johnson’s third claim regarding the sperm evidence.
Johnson, 104 So.3d at 1020-21. Accordingly, the postconviction court denied each of Johnson’s postconviction claims challenging his conviction for McCahon’s mur *1041 der and the accompanying death sentence. Johnson now appeals the posteonviction court’s ruling.
III. ANALYSIS
On appeal, Johnson raises exactly the same issues that he raised when appealing the posteonviction court’s denial of his posteonviction claims in the case regarding the murder of White. Moreover, Johnson presents the same arguments in support of each issue because Johnson filed identical briefs on appeal in both capital eases. Specifically, Johnson raises the following claims on appeal: (1) the posteonviction court erred in denying his ineffective assistance of counsel claim based on his trial counsel’s mishandling of expert witnesses Dr. Walter Afield, Dr. Michael Maher, and Dr. Richard Ofshe; (2) the posteonviction court erred in denying his ineffective assistance of counsel claim on the mishandling of witness Dr. Brigham in the case related to victim Cornell because Johnson’s conviction in that ease was used as an aggravating factor in this case; (3) the posteonviction court erred in denying his ineffective assistance of counsel claim based on his trial counsel’s failure to employ a mitigation specialist; (4) the post-conviction court erred in summarily denying his claim that the trial court’s finding of the prior violent felony aggravator is based on an invalid conviction; (5) the posteonviction court erred in summarily denying his claim that Rule Regulating the Florida Bar 4-3.5(d)(4) unconstitutionally prevented Johnson from interviewing the jurors in this case; (6) the posteonviction court erred in summarily denying his claim that Florida’s death sentencing statute, as applied, is unconstitutional; (7) the posteonviction court erred in summarily denying his claim that the trial court erred in preventing Johnson from informing the jury about his ineligibility for parole and the possible sentences he would receive in his other three trials; (8) the posteonvietion court erred in summarily denying his claim that the penalty phase jury instructions unconstitutionally shifted the burden to Johnson to prove that death was an inappropriate sentence; (9) the posteonviction court erred in summarily denying his claim that Florida’s method of execution constitutes cruel and unusual punishment; (10) the posteonviction court erred in summarily denying his claim that his convictions and sentences are materially unreliable due to the cumulative effect of the errors alleged in Johnson’s posteonviction motion; and (11) the posteonviction court erred in summarily denying his claim that his right against cruel and unusual punishment may be violated because, at the time of his execution, Johnson might be incompetent. Finally, Johnson argues (12) that the posteonviction court erred in summarily denying various pro se claims relating to the White case: (a) the prosecutor engaged in misconduct by arguing facts not in evidence, and defense counsel was ineffective in failing to object to that misconduct; (b) the prosecutor engaged in misconduct by presenting false evidence at the suppression hearing, and defense counsel was ineffective in failing to object to that misconduct; (c) the prosecutor engaged in misconduct by presenting inconsistent theories, and defense counsel was ineffective in failing to object to that misconduct; (d) defense counsel rendered ineffective assistance by failing to introduce evidence of Johnson’s actual innocence; (e) the State used illegally obtained rolled fingerprints; and (f) Johnson’s arrest, search, and seizure were based on an affidavit that contained false information, and defense counsel was ineffective in failing to present this fact at the suppression hearing.
We have identified two issues raised in both this case and the case related to the White murder that require additional analysis here: Johnson’s argument that the posteonviction court erred in denying his *1042 ineffective assistance of counsel claim based on his counsel’s failure to properly authenticate medical records at both of his capital trials; and Johnson’s argument that the postconviction court erred in summarily denying various pro se claims challenging Johnson’s conviction and sentence for the murder of White. For the reasons expressed below, we conclude that the postconviction court did not err in denying these claims as they relate to Johnson’s murder conviction and accompanying death sentence for the murder of McCa-hon.
First, we address the portion of Johnson’s third claim on appeal challenging his trial counsel’s failure to properly authenticate medical records containing evidence regarding two suicide attempts by Johnson. Johnson alleges that counsel’s error was more egregious in this case because the trial court had sustained the State’s objection to the medical records as unauthenticated in the earlier trial for the murder of White. Thus, Johnson argues, counsel had additional time and notice to properly authenticate the records before attempting to introduce them at the trial for the murder of McCahon but failed to do so. The postconviction court denied Johnson’s claim after an evidentiary hearing. Accordingly, we review de novo that court’s ruling on Johnson’s ineffective assistance claim but defer to its findings of fact if they are supported by competent, substantial evidence in the record. Porter v. State, 788 So.2d 917, 923 (Fla.2001).
Similar to our holding denying this claim as it related to Johnson’s postconviction appeal in the case related to White’s murder, we conclude that regardless of any alleged deficiency by Johnson’s trial counsel due to counsel’s failure to properly authenticate the medical records, Johnson suffered no prejudice as a result of such error. As in the case regarding White’s murder, the record shows that the jury and sentencing judge at the penalty phase trial for the McCahon murder heard evidence regarding one of Johnson’s suicide attempts through the testimony of Johnson’s mother. Also, as in Johnson’s capital case for the White murder, the record establishes that any evidence regarding Johnson’s second attempt on his life would have opened the door to harmful testimony. Dr. Ofshe testified at the suppression hearing that Johnson admitted that his second suicide attempt was a half-hearted effort designed to convince doctors that he was mentally ill. Because Johnson has not shown any plausible reason why the State could not have called Dr. Ofshe to testify to the same effect at trial in response to the medical records, Johnson has not established a reasonable probability that absent the alleged error, the penalty phase jury would have reached a different conclusion. Moreover, this Court held on direct appeal of the conviction and sentence for the White murder that the evidence of Johnson’s mental disturbance presented during the suppression hearing — which was consolidated for Johnson’s two capital cases — “did not rise to the level of a statutory mitigator.” Johnson, 660 So.2d at 663. Because evidence of both suicide attempts was presented at the suppression hearing, counsel’s alleged deficiency does not undermine our confidence in the sentencing judge’s conclusion that the statutory mental mitigator did not exist in this case. Accordingly, we affirm the postcon-viction court’s denial of Johnson’s claim as it relates to the McCahon murder.
Second, we address Johnson’s final issue on appeal, which challenges the post-conviction court’s denial of several pro se claims in the case relating to White’s murder. Specifically, Johnson alleges that his trial counsel was ineffective for failing to object when the State argued based on improper evidence that Johnson had sexually battered White, when the State argued at the suppression hearing that two *1043 of the hairs recovered from White’s body were identified as Johnson’s and when the State subsequently presented theories at trial inconsistent with theories it had previously argued at the suppression hearing. Johnson also argues that his trial counsel was ineffective in failing to introduce evidence that Johnson was a chronic nail biter — because such evidence would conclusively have established Johnson’s “actual innocence” in the case relating to White — and in failing to discover and present evidence that a key piece of evidence supporting the search warrant in that case was false.
Johnson’s challenges to counsel’s performance in the case for White’s murder are only relevant to this case because Johnson’s conviction in that case was used to support the prior violent felony aggra-vator in this case. As it relates to Johnson’s conviction and sentence for the McCahon murder, this issue is therefore analogous to the claim addressed by the United States Supreme Court in Johnson v. Mississippi 486 U.S. 578, 583-90, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), which granted postconviction relief on a defendant’s claim that the sentencing court’s finding of the prior violent felony aggravator based on a reversed conviction was unconstitutional. We have previously held that a Johnson claim is not cognizable as long as the conviction underlying the aggravating factor is still a valid conviction. See Lukehart v. State, 70 So.3d 503, 513 (Fla.2011). Moreover, we have affirmed the denial of Johnson’s postconviction challenge to his conviction and death sentence for the case relating to White. See Johnson, 104 So.3d at 1031-32. The conviction for the murder of White therefore remains a proper basis for the prior violent felony aggravator in this case. See Lukehart, 70 So.3d at 513. Accordingly, we deny Johnson’s final appellate issue as it related to his convictions and sentences for the murder of McCahon.
Having considered the remainder of Johnson’s claims presented in this postcon-viction appeal, we deny each of the claims for the reasons expressed in our opinion denying the identical claims as presented in Johnson’s postconviction appeal in the case related to the murder of White. See Johnson, 104 So.3d at 1021-32.
IV. CONCLUSION
For the reasons stated above, we conclude that Johnson is not entitled to post-conviction relief from his conviction and sentence for the first-degree murder of Jackie McCahon. Accordingly, we affirm the circuit court’s denial of Johnson’s motion for postconviction relief.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, CANADY, LABARGA, and PERRY, JJ., concur.
QUINCE, J., recused.

. Johnson’s amended rule 3.850 motion is governed by the requirements applicable to rule 3.850, rather than Florida Rule of Criminal Procedure 3.851, because his amended motion relates back to his original motion, which was filed before October 1, 2001, the effective date of rule 3.851. See Franqui v. State, 59 So.3d 82, 95 n. 13 (Fla.2011).

. See, e.g., Johnson v. State, No. SC78,336 (Fla. order filed Jun. 4, 1997) (unpublished order tolling time for filing of Johnson’s amended motion due to the financial condition of the Office of the Capital Collateral Representative); In re Amendments to Fla. Rule Crim. Pro. 3.852, 700 So.2d 680, 681 (Fla.1997) (tolling time for filing Johnson’s postconviction motion for ninety days to allow collateral counsel to transition from a single office to three regional offices); Amendments to Fla. Rules Crim. Pro. 3.851 and 3.850, 719 So.2d 869, 871-72 (Fla.1998) (tolling time for Johnson to file motion under rule 3.850 or 3.851 until October 1, 1998, based on insufficient funding of collateral counsel); State v. Johnson, Nos. 88 CF 3200, et al. (Fla. 12th Cir. Ct. order filed Feb. 13, 2002) (extending date for filing of Johnson’s amended motion to March 4, 2002).